**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| **IN RE BUMBLE, INC.**<br>**SECURITIES LITIGATION** | **Civil Action No. 22-cv-624 (DLC)**<br><br>**CLASS ACTION**<br><br><br>**DEMAND FOR JURY TRIAL** |

**CONSOLIDATED AMENDED CLASS ACTION COMPLAINT**

# TABLE OF CONTENTS

**Page**

I.  PRELIMINARY STATEMENT ................................................................ 1

II. JURISDICTION AND VENUE .............................................................. 5

III. PARTIES .......................................................................................... 6

    A.  Plaintiffs ..................................................................................... 6

    B.  Defendants .................................................................................. 7

        1.  Bumble ................................................................................ 7

        2.  The Executive Defendants ................................................... 7

        3.  The Blackstone Defendants ................................................. 8

        4.  The Director Defendants .................................................... 13

        5.  The Underwriter Defendants .............................................. 14

IV. SUBSTANTIVE ALLEGATIONS ........................................................ 18

    A.  Relevant Background .................................................................. 19

        1.  Bumble's Business .............................................................. 19

        2.  Blackstone Acquires A Controlling Interest in Bumble ......... 21

        3.  Blackstone and Herd Quickly Take Bumble Public Through An
           IPO .................................................................................... 25

    B.  Bumble's Growth Falters As Overall Paying Users Decline In The Third
        Quarter of 2021, Driven By Significant Declines In Badoo Paying Users .......... 28

    C.  Blackstone Causes Bumble to Conduct the SPO Pursuant to Materially
        Misleading Offering Materials .................................................... 32

    D.  The Truth Concerning Bumble's Slowing and Declining Growth <u>And</u>
        Paying User Growth Begins to Emerge ...................................... 34

    E.  Subsequent Developments ......................................................... 37

V.  DEFENDANTS' MATERIALLY FALSE AND MISLEADING STATEMENTS
    AND OMISSIONS IN THE SPO OFFERING DOCUMENTS ..................... 38

A.    Misstatements and Omissions About Growth And Increasing Paying Users ....... 38

B.    Misstatements and Omissions Presenting Risks As Mere Hypothetical
      Possibilities When They Had Already Materialized .............................................. 40

C.    Materially False and Misleading Omissions in Bumble's  SPO Offering
      Documents (Item 303) ......................................................................................... 42

VI.    INAPPLICABILITY OF STATUTORY SAFE HARBOR AND BESPEAKS
       CAUTION DOCTRINE ................................................................................................. 43

VII.    CLASS ACTION ALLEGATIONS ................................................................................. 44

VIII.    CLAIMS FOR RELIEF UNDER THE SECURITIES ACT ........................................... 45

COUNT I ...................................................................................................................................... 45

For Violations of Section 11 of the Securities Act  (Against Bumble, the Executive
     Defendants,  the Director Defendants, and the Underwriter Defendants) ....................... 45

COUNT II ..................................................................................................................................... 47

For Violations of Section 12(a)(2) of the Securities Act  (Against Bumble and the
     Underwriter Defendants) .................................................................................................. 47

COUNT III .................................................................................................................................... 49

For Violations of Section 15 of the Securities Act  (Against the Blackstone Defendants
     and the Executive Defendants) ........................................................................................ 49

IX.    PRAYER FOR RELIEF .................................................................................................... 52

X.    JURY DEMAND ............................................................................................................... 53

Lead Plaintiff Louisiana Sheriffs' Pension & Relief Fund ("Louisiana Sheriffs" or "Plaintiff"), by and through its attorneys, and on behalf of all others similarly situated, alleges the following upon information and belief, except as to those allegations concerning Plaintiff, which are alleged upon personal knowledge. Plaintiff's information and belief are based on, among other things, counsel's investigation, which includes without limitation: (a) a review and analysis of regulatory filings made by Defendant Bumble Inc. ("Bumble" or the "Company") with the U.S. Securities and Exchange Commission ("SEC"); (b) a review and analysis of press releases and media reports issued and disseminated by the Company; (c) a review of other publicly available information concerning the Company, including news stories, analyst reports and court filings; and (d) investigative interviews with former Bumble employees having first-hand knowledge of the Company's business and operations.

## I.    PRELIMINARY STATEMENT

1.    This federal securities class action asserts strict liability and negligence-based claims under the Securities Act of 1933 (the "Securities Act") arising from Defendants' materially untrue and misleading statements and omissions concerning Bumble's business and financial performance made in a registration statement. As detailed below, Defendants took Bumble, the operator of the online dating applications Bumble and Badoo, public in February 2021. Bumble was controlled by its co-founder and CEO, Whitney Wolfe Herd, and the private equity behemoth Blackstone (defined below), which had sweeping rights to appoint directors to the Company's Board, to require the Company to offer securities to the public and to receive detailed, sensitive, non-public information about the operations and finances of the Company. Seven months after the IPO, Defendants—at Blackstone's request—launched a secondary public offering (the "SPO") which allowed Blackstone to sell millions of shares of Bumble Class A common stock. The September 2021 SPO was based on a misleading story about Bumble's growth and, in particular,

1

growth in paying users[1] told in materially defective offering documents, including a SPO Registration Statement, Prospectus and other Bumble SEC filings incorporated therein, (collectively, the "SPO Registration Statement" or the "SPO Offering Documents").

2.    In the SPO, Blackstone—aided by the Company, its executives and directors, and the investment banks who underwrote the offering—rushed to unload more than 20 million Bumble shares onto unsuspecting investors, which lined Blackstone's pockets with over $1.1 billion.  Unbeknownst to investors, at the time of the SPO, Bumble was suffering from a significant decline in growth and paying user growth—driven by *inter alia* a precipitous decline in the number of paying users of Bumble's Badoo dating app.  In November 2021, only two months after Blackstone pocketed over a billion dollars through the SPO, Bumble revealed its declining growth metrics to the investing public.  In response, the price of Bumble shares plunged dramatically, declining more than 24.4% over the next two trading days.

3.    Bumble is the public holding company that operates two well-known online dating apps Bumble and Badoo ("Bumble App" and "Badoo App," respectively).  In 2020, in the wake of accusations of a misogynistic culture at Badoo, Blackstone purchased a multi-billion-dollar stake in the Bumble parent company (then called MagicLab) from Russian billionaire Andrey Andreev.  In early 2021, Blackstone and CEO Herd took Bumble public.

4.    At the time of Bumble's IPO, Blackstone and Herd entered into agreements that cemented their power and control over the Company.  These included a Stockholders Agreement, under which Blackstone and Herd beneficially owned 96% of the combined voting power of Class A and Class B common stock, thereby rendering Bumble a "controlled company," exempt from

---

[1] Bumble's SEC filings, including the SPO Offering Documents (defined below), identified as "key operating metrics" paying users, which were reported for each of the Bumble App and the Badoo App as well as Total Paying Users and Average Revenue Per Paying User, which was similarly reported for each of the Bumble App and the Badoo App as well as Total Paying Users.

certain corporate governance standards.  The Stockholders Agreement also mandated that Blackstone be given vital non-public information regarding Bumble's operations and finances, including reports like operating and capital expenditure budgets and information packages relating to the Company's operations and cash flows.  Further, the agreement gave Blackstone the right to review the Company's books and records and to discuss its affairs, finances, and condition with Company officers.

5.      Blackstone's control over Bumble was extended further through a second agreement—a Registration Rights Agreement.  This agreement gave Blackstone the right to require Bumble to sell Blackstone's Bumble holdings to the public through a registered offering like the SPO—at the Company's expense.  In such an offering, Blackstone had full rights to review and comment on the offering materials and to select the underwriters for the offering.

6.      In September 2021, armed with control over the Company and sensitive Company operating and financial information, Blackstone exercised its rights under the Registration Rights Agreement and required Bumble to undertake the SPO.  On September 10, 2021, Bumble offered Blackstone's Company stock to the public.  Given its control over Bumble, Blackstone was identified in the SPO Offering Documents as Bumble's "Sponsor" and those materials explicitly stated that Blackstone and Herd, as Bumble's Sponsor and Founder, respectively, "control us and their interests may conflict with ours or yours in the future."  The SPO Offering Documents also emphasized that "Bumble Inc. is controlled by investment funds of Blackstone Inc."

7.      In the SPO Offering Documents, Defendants touted Bumble's growth, including with respect to paying users.  For example, Defendants trumpeted the Company's ***"growing" community***, boasted of the "***increasing propensity for users to pay***," claimed that they "***expect to increase paying users***," and cited results showing a nearly 25% increase in Total Paying Users

over a year.  The SPO Offering Documents also presented risks to Bumble's growth and, in particular, increasing paying users as mere hypothetical possibilities, stating, for example, that "at some point we *may* face challenges increasing our Paying Users" and "*if* … users … do not convert to paying users, our revenue, financial results and business *may* be significantly harmed."

8.      Unknown to investors who bought stock in the SPO, the SPO Offering Documents were materially misleading.  In reality, Bumble had experienced a net decrease in total paying users at the time of the SPO.  Indeed, as the Company later admitted, Bumble had overall lost tens of thousands of paying users during the third quarter of 2021 ("3Q21"), including because the Badoo App had lost over 120,000 paying users quarter-over-quarter and over 124,000 paying users year-over-year.  And for the Bumble App, paying user growth slowed significantly during 3Q21, missing consensus estimates.  Defendants, eager to help Blackstone in its rush to unload its Bumble holdings unto unsuspecting public investors, negligently and misleadingly omitted this reality in the SPO Offering Documents.

9.      Bumble's own former employees confirmed the Company's decline.  For example, a former Bumble employee (defined as "FE-1" below) reported that growth was declining in the U.S. market, a trend that was discussed in meetings, including with Chief Marketing Officer (CMO) Dominic Gallello.  According to FE-1, the message from executives was that growth was slowing due to the natural maturity of the U.S. market.  Another former Bumble employee (defined as "FE-2" below) reported that, during FE-2's tenure at Bumble from June 2021 to September 2021, growth at Badoo was "non-existent" and the Company was an "absolute shambles."  FE-2 recalled discussing Badoo's decline with CMO Gallello in July and August 2021, and reported that Gallello said Badoo's decline meant the Company needed a new marketing plan.

10.     Less than two months after the SPO, the truth concerning the state of Bumble's business and operations began to publicly emerge.  On November 10, 2021, Bumble announced its 3Q21 financial results.  The Company disclosed that, rather than growing paying users, the Company's total paying user count had declined to 2.86 million, well below the Company's 2.9 million reported paying users as of June 30, 2021—a figure that Defendants had misleadingly highlighted in the SPO Offering Documents.  This was driven by a material decrease in Badoo App paying users, which had declined quarter-over-quarter and year-over-year, and had resulted in a year-over-year decline in revenue.  Growth in Bumble App paying users had also slowed significantly.

11.     The market was shocked.  In response to the November 10, 2021 disclosures, Bumble's stock price fell precipitously, free-falling 19.25% on November 11, 2021 and another 5.21% on November 12, 2021.  Analysts focused heavily on Bumble's negative disclosures.  For example, in contrast to Defendants' statements touting an "increasing propensity for users to pay" in the SPO Offering Documents only weeks earlier, BMO analysts noted after the November 10, 2021 disclosures that the Company's Badoo App was "feeling the brunt *of lagging propensity to pay*."  Investors suffered massive losses.

12.     Plaintiffs, on behalf of themselves and the Class they seek to represent, now bring this suit to recover the losses they have suffered as a result of Defendants' materially false, misleading, and incomplete statements.

## II.    JURISDICTION AND VENUE

13.     This Court has jurisdiction over these claims under Section 22 of the Securities Act (15 U.S.C. §77v) and 28 U.S.C. §1331.  The claims asserted herein arise under and Sections 11, 12(a)(2), and 15 of the Securities Act (15 U.S.C. §§ 77k, 77*l*, and 77o).

14.    Venue is proper in this Judicial District under Section 22 of the Securities Act (15 U.S.C. § 77v(a)) and 28 U.S.C. §1391(b), (c) and (d).  Many of the acts, transactions and conduct that constitute violations of law complained of herein, including the dissemination to the public of materially untrue and misleading statements, occurred in substantial part in this Judicial District.

15.    Further, Bumble's stock trades on the NASDAQ, located within this Judicial District.  And the Underwriters who served as co-lead book-running managers of Bumble's SPO maintain their principal places of business in this District where they acted as representatives of the other Underwriter Defendants (defined below) in the SPO, conducting the SPO in and from this District, and closing the SPO in this District.  The Underwriting Agreement signed by Bumble and the Underwriter Defendants also expressly provides:

> The parties hereto agree that any suit or proceeding arising in respect of this Agreement or the Representatives' engagement will be tried exclusively in the U.S. District Court for the Southern District of New York . . . and the parties hereto agree to submit to the jurisdiction of, and to venue in, such court[], and waive, to the fullest extent they may effectively do so, any objection which they may now or hereafter have to the laying of venue of any such proceeding.

16.    In connection with the acts, conduct, and other wrongs alleged in this Complaint, Defendants, either directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the United States mails, interstate wire and telephone communications, and the facilities of the NASDAQ, a national securities exchange.

## III.    PARTIES

### A.    Plaintiffs

17.    Lead Plaintiff Louisiana Sheriffs' Pension & Relief Fund ("Louisiana Sheriffs") is a public pension fund that manages approximately $4.5 billion in assets for the benefit of its approximately 20,000 active and retired participants.  As set forth in the certification attached hereto as Exhibit A, which is incorporated herein by reference, Louisiana Sheriffs purchased

Bumble common stock in the SPO pursuant or traceable to the untrue and misleading SPO Offering Documents and was damaged thereby.

### B.    Defendants

#### 1.    Bumble

18.    Defendant Bumble is incorporated in Delaware, and its stock trades on the NASDAQ under the ticker symbol "BMBL." Bumble operates two online-dating apps, Bumble ("Bumble App") and Badoo ("Badoo App"). According to the SPO Offering Documents, Bumble is a public holding company whose sole material asset is a controlling equity interest in Bumble Holdings. Further, Bumble is the general partner of Bumble Holdings and operates and controls all of the business and affairs of Bumble Holdings, has the obligation to absorb losses and receive benefits from Bumble Holdings and, through Bumble Holdings, conducts the Company's business.

#### 2.    The Executive Defendants

19.    Defendant Whitney Wolfe Herd ("Herd") was at the time of the SPO, the Founder, Chief Executive Officer and a director of Bumble. Defendant Herd signed the SPO Registration Statement. Defendant Herd, along with Blackstone, was a controlling shareholder of Bumble at the time of the SPO. Indeed, the SPO Offering Documents identified Herd as the Company's "Founder" and expressly stated that "Our Sponsor [*i.e.*, Blackstone] and our Founder [*i.e.,* Herd] control us and their interests may conflict with ours or yours in the future."

20.    Defendant Anuradha B. Subramanian ("Subramanian") was the Chief Financial Officer of Bumble at the time of the SPO. Defendant Subramanian signed the SPO Registration Statement.

21.    Defendants Herd and Subramanian are together referred to herein as the "Executive Defendants" and, collectively with the Director Defendants, are referred to as the "Individual Defendants."

### 3.    The Blackstone Defendants

22.    Defendant Blackstone Inc. and its affiliates identified herein (collectively, "Blackstone" or the "Blackstone Defendants") run the world's largest alternative asset management business, which includes the management of corporate private equity funds, real estate funds, hedge fund solutions, credit-oriented funds and closed-end mutual funds.  Through its different businesses, as of June 30, 2021, Blackstone had total assets under management of approximately $684 billion and, as of June 30, 2022, had total assets under management of $940.8 billion.  At the time of the SPO, Blackstone controlled Bumble.  Indeed, the SPO Offering Documents expressly stated that "Bumble Inc. is controlled by investment funds of Blackstone Inc." and, given its control over Bumble, Blackstone was identified as Bumble's "Sponsor."

23.    Blackstone was affiliated with or employed several members of the Bumble Board of Directors (the "Board") at the time of the SPO, including for example (i) Defendant Anderson, who was a senior managing director and the global head of public affairs and marketing at Blackstone; (ii) Defendant Bavishi, who was a managing director in Blackstone's private equity group; (iii) Defendant Korngold, who was a senior managing director and global head of Blackstone's Growth Equities Business; (iv) Defendant Morgan, who was Blackstone's global head of portfolio operations; and (v) Defendant Bromberg, who has been a Senior Advisor to Blackstone since May 2022.  Further, pursuant to the Stockholders Agreement, Blackstone was entitled to designate a non-voting observer to attend meetings of the Board.  Blackstone appointed Martin Brand, a senior managing director and co-head of U.S. Acquisitions for Blackstone's Private Equity Group, to serve as the non-voting observer.

24.    Prior to the SPO, the Blackstone Defendants beneficially owned 45.7% of Bumble's Class A common stock and 23.2% of Bumble's Common Units, which gave Blackstone combined voting power of 76.1% over Bumble.  Together, the parties to the Stockholder

Agreement, including the Blackstone Defendants and Defendant Herd, controlled as a group 94.9% of the combined voting power of Bumble prior to the SPO.

25.    Bumble's SEC filings stated that "for so long as our Sponsor [Blackstone] continues to own a significant percentage of our stock, our Sponsor will be able to cause or prevent a change of control of our company or a change in the composition of our board of directors and could preclude any unsolicited acquisition of our company."  In light of the pervasive control Blackstone exerted over Bumble, the Company's SEC filings stated that the "concentration of ownership could deprive you of an opportunity to receive a premium for your shares of Class A common stock as part of a sale of our company and ultimately might affect the market price of our Class A common stock."

26.    Also named herein as Blackstone Defendants are certain funds and individuals affiliated with Blackstone including:

    (a)    BX Buzz ML-1 Holdco L.P. ("BML-1 Holdco"), a selling stockholder in the SPO, and its affiliates:

        (i)    BX Buzz ML-1 GP LLC ("BML-1 GP"), the general partner of BML-1 Holdco;

        (ii)    BXG Buzz Holdings L.P. ("BXG Buzz Holdings"), a signatory to the Bumble Stockholders Agreement and Registration Rights Agreement and the sole limited partner of BML-1 Holdco and sole member of BML-1 GP;

        (iii)    BXG Holdings Manager L.L.C. ("BXG Holdings Manager"), the general partner of BXG Buzz Holdings;

        (iv)    Blackstone Growth Associates L.P. ("Blackstone Growth Associates"), the managing member of BXG Holdings Manager;

        (v)    BXGA L.L.C., the general partner of Blackstone Growth Associates.

    (b)    BX Buzz ML-2 Holdco L.P. ("BML-2 Holdco"), a selling stockholder in the SPO, and its affiliates:

(i)     BX Buzz ML-2 GP LLC ("BML-2 GP"), the general partner of BML-2 Holdco;

(ii)    BCP Buzz Holdings L.P. ("BCP Buzz Holdings"), a signatory to the Bumble Stockholders Agreement and Registration Rights Agreement and the sole limited partner of BML-2 Holdco and the sole member of BML-2 GP;

(iii)   BCP VII Holdings Manager – NQ L.L.C. (BCP VII Holdings Manager"), the general partner of BCP Buzz Holdings;

(iv)    Blackstone Management Associates VII NQ L.L.C. ("Blackstone Management Associates VII"), the managing member of BCP VII Holdings Manager;

(v)     BMA VII NQ L.L.C. ("BMA VII") is the managing member of Blackstone Management Associates VII.

(c)  BX Buzz ML-3 Holdco L.P. ("BML-3 Holdco"), a selling stockholder in the SPO, and its affiliates:

(i)     BX Buzz ML-3 GP LLC ("BML-3 GP"), the general partner of BML-3 Holdco;

(ii)    BSOF Buzz Aggregator L.L.C. ("BSOF"), a signatory to the Bumble Stockholders Agreement and Registration Rights Agreement and the sole limited partner of BML-3 Holdco and the sole member of BML-3 GP;

(iii)   Blackstone Strategic Opportunity Associates L.L.C. ("BSOA"), the managing member of BSOF;

(iv)    Blackstone Holdings II L.P. ("Blackstone Holdings II"), the sole member of BSOA, and also the managing member of each of BTOA—NQ L.L.C., BTO DE GP—NQ L.L.C., BXGA L.L.C., and BMA VII NQ L.L.C.;

(v)     Blackstone Holdings I/II GP L.L.C.; the general partner of Blackstone Holdings II.

(d)  BX Buzz ML-4 Holdco L.P. ("BML-4 Holdco"), a selling stockholder in the SPO, and its affiliates:

(i)     BX Buzz ML-4 GP LLC ("BML-4 GP"), the general partner of BML-4 Holdco;

(ii)    BTO Buzz Holdings II L.P. ("BTO"), a signatory to the Bumble Stockholders Agreement and Registration Rights Agreement and

the sole limited partner of BML-4 Holdco and the sole member of BML-4 GP;

(iii)    BTO Holdings Manager L.L.C. ("BTO Holdings Manager"), the general partner of BTO;

(iv)    Blackstone Tactical Opportunities Associates L.L.C. ("BTOA"), the managing member of BTO Holdings Manager;

(v)    BTOA L.L.C., the managing member of BTOA;

(vi)    Blackstone Holdings III L.P. ("Blackstone Holdings III"), the managing member of BTOA L.L.C.;

(vii)    Blackstone Holdings III GP L.P. ("Blackstone Holdings III GP"), the general partner of Blackstone Holdings III;

(viii)    Blackstone Holdings III GP Management L.L.C. ("Blackstone Holdings III GP Management"), the general partner of Blackstone Holdings III GP L.P.  Blackstone Inc. is the sole member Blackstone Holdings III GP Management.

(e)    BX Buzz ML-5 Holdco L.P. ("BML-5 Holdco"), a selling stockholder in the SPO, and its affiliates:

(i)    BX Buzz ML-5 GP LLC ("BML-5 GP"), the general partner of BML-5 Holdco;

(ii)    Blackstone Buzz Holdings L.P. ("Blackstone Buzz Holdings"), a signatory to the Bumble Stockholders Agreement and Registration Rights Agreement and the sole limited partner of BML-5 Holdco and the sole member of BML-5 GP;

(iii)    BTO Holdings Manager—NQ L.L.C. ("BTO Holdings Manager NQ"), the general partner of Blackstone Buzz Holdings;

(iv)    Blackstone Tactical Opportunities Associates—NQ L.L.C. ("BTOA NQ"), the managing member of BTO Holdings Manager NQ;

(v)    BTOA—NQ L.L.C. is the sole member of BTO Holdings Manager NQ.

(f)    BX Buzz ML-6 Holdco L.P. ("BML-6 Holdco"), a selling stockholder in the SPO, and its affiliates:

(i)    BX Buzz ML-6 GP LLC ("BML-6 GP"), the general partner of BML-6 Holdco;

    (ii)  Blackstone Tactical Opportunities Fund—FD L.P. ("BTOF"), a signatory to the Bumble Stockholders Agreement and Registration Rights Agreement and the sole limited partner of BML-6 Holdco and the sole member of BML-6 GP;

    (iii)  Blackstone Tactical Opportunities Associates III—NQ L.P. ("BTOA III"), the general partner of BTOF;

    (iv)  BTO DE GP—NQ L.L.C. ("BTO DE"), the general partner of BTOA III.

  (g)  BX Buzz ML-7 Holdco L.P. ("BML-7 Holdco"), a selling stockholder in the SPO, and its affiliates:

    (i)  BX Buzz ML-7 GP LLC ("BML-7 GP"), the general partner of BML-7 Holdco;

    (ii)  Blackstone Family Investment Partnership—Growth ESC L.P. ("BFIP"), a signatory to the Bumble Stockholders Agreement and Registration Rights Agreement and the sole limited partner of BML-7 Holdco and the sole member of BML-7 GP;

    (iii)  BXG Side-by-Side GP L.L.C. ("BXG"), the general partner of BFIP;

    (iv)  Blackstone Holdings II L.P. ("Blackstone Holdings II"), the sole member of BXG.

  (h)  Blackstone Holdings I/II GP L.L.C., of which Blackstone Inc. is the sole member;

  (i)  Blackstone Group Management L.L.C., the sole holder of the Series II preferred stock of Blackstone Inc.  Blackstone Group Management L.L.C. is wholly-owned by Blackstone's senior managing directors and controlled by its founder, Stephen A. Schwarzman;

  (j)  Defendant Stephen A. Schwarzman is the founder and CEO of Blackstone. Schwarzman controls Blackstone Group Management L.L.C., which is the sole holder of the Series II preferred stock of Blackstone.

  27.  The SPO Offering Documents specifically identified each of the Blackstone entities and individuals listed above and stated *inter alia* that "Each of the Blackstone entities described [above] and Stephen A. Schwarzman may be deemed to beneficially own the [Bumble] securities directly or indirectly controlled by such Blackstone entities or him."

### 4.     The Director Defendants

28.     Defendant Ann Mather ("Mather") was, at all relevant times, Chair of the Board of Directors of the Company.  Defendant Mather signed or authorized signing the SPO Registration Statement.

29.     Defendant Christine L. Anderson ("Anderson") was, at all relevant times, a director of the Company.  Defendant Anderson signed or authorized signing the SPO Registration Statement.  Defendant Anderson is also a senior managing director and Global Head of External Relations at Blackstone, and oversees marketing worldwide.

30.     Defendant R. Lynn Atchison ("Atchison") was, at all relevant times, a director of the Company.  Defendant Atchison signed or authorized signing the SPO Registration Statement.

31.     Defendant Sachin J. Bavishi ("Bavishi") was, at all relevant times, a director of the Company.  Defendant Bavishi signed or authorized signing the SPO Registration Statement. Defendant Bavishi is a managing director in Blackstone's Private Equity Group.

32.     Defendant Matthew S. Bromberg ("Bromberg") was, at all relevant times, a director of the Company.  Defendant Bromberg signed or authorized signing the SPO Registration Statement.

33.     Defendant Amy M. Griffin ("Griffin") was, at all relevant times, a director of the Company.  Defendant Griffin signed or authorized signing the SPO Registration Statement.

34.     Defendant Jonathan C. Korngold ("Korngold") was, at all relevant times, a director of the Company.   Defendant Korngold signed or authorized signing the SPO Registration Statement.  Defendant Korngold is the Global Co-Head of Technology Investing and Head of Blackstone's Growth Equity Business.

35.     Defendant Jennifer B. Morgan ("Morgan") was, at all relevant times, a director of the Company.  Defendant Morgan signed or authorized signing the SPO Registration Statement. Defendant Morgan is Blackstone's Global Head of Portfolio Transformation and Talent.

36.     Defendant Elisa A. Steele ("Steele") was, at all relevant times, a director of the Company.  Defendant Steele signed or authorized signing the SPO Registration Statement.

37.     Defendant Pamela A. Thomas-Graham ("Thomas-Graham") was, at all relevant times, a director of the Company.  Defendant Thomas-Graham signed or authorized signing the SPO Registration Statement.

38.     Defendants Mather, Anderson, Atchison, Bavishi, Bromberg, Griffin, Korngold, Morgan, Steele, and Thomas-Graham are collectively referred to herein as the "Director Defendants."

39.     The Executive Defendants and the Director Defendants are together referred to herein as the "Individual Defendants."  The Individual Defendants each signed the Registration Statement, and solicited investors for the SPO for their own benefit and the benefit of Bumble's controlling shareholders Blackstone and its affiliates.

### 5.     The Underwriter Defendants

40.     Defendant Goldman Sachs & Co. LLC ("Goldman Sachs") served as co-lead book-running manager and underwriter of the SPO.

41.     Defendant Citigroup Global Markets Inc. ("Citigroup") served as co-lead book-running manager and underwriter of the SPO.

42.     Defendant Morgan Stanley & Co. LLC ("Morgan Stanley") served as an underwriter on the SPO.

43.     Defendant J.P. Morgan Securities LLC ("JP Morgan") served as an underwriter on the SPO.

44.    Defendant Blackstone Securities Partners L.P. ("Blackstone Securities Partners") served as an underwriter on the SPO.  Blackstone Securities Partners is an affiliate of Blackstone. The SPO Offering Documents stated:

> "Because Blackstone Securities Partners L.P. is an underwriter in this offering and its affiliates own in excess of 10% of our issued and outstanding Class A common stock, Blackstone Securities Partners L.P. is deemed to have a "conflict of interest" under Financial Industry Regulatory Authority, Inc. ("FINRA") Rule 5121."

45.    Defendant Evercore Group L.L.C. ("Evercore") served as an underwriter on the SPO.

46.    Defendant Jefferies LLC ("Jefferies") served as an underwriter on the SPO.

47.    Defendant RBC Capital Markets, LLC ("RBC") served as an underwriter on the SPO.

48.    Defendant BMO Capital Markets Corp.("BMO") served as an underwriter on the SPO.

49.    Defendant BTIG, LLC ("BTIG") served as an underwriter on the SPO.

50.    Defendant Cowen and Company, LLC ("Cowen") served as an underwriter on the SPO.

51.    Defendant Mizuho Securities USA LLC ("Mizuho") served as an underwriter on the SPO.

52.    Defendant Raymond James & Associates, Inc. ("Raymond James") served as an underwriter on the SPO.

53.    Defendant Stifel, Nicolaus & Company, Incorporated ("Stifel") served as an underwriter on the SPO.

54.    Defendant SMBC Nikko Securities America, Inc.("SMBC") served as an underwriter on the SPO.

55.    Defendant AmeriVet Securities, Inc. ("AmeriVet") served as an underwriter on the SPO.

56.    Defendant C.L. King & Associates, Inc. ("C.L. King") served as an underwriter on the SPO.

57.    Defendant Drexel Hamilton, LLC ("Drexel Hamilton") served as an underwriter on the SPO.

58.    Defendant Loop Capital Markets LLC ("Loop  Capital") served as an underwriter on the SPO.

59.    Defendant R. Seelaus & Co., LLC ("R. Seelaus") served as an underwriter on the SPO.

60.    Defendant Samuel A. Ramirez & Company, Inc. ("Samuel A. Ramirez") served as an underwriter on the SPO.

61.    Defendant Siebert Williams Shank & Co., LLC ("Siebert") served as an underwriter on the SPO.

62.    Defendant Telsey Advisory Group LLC ("Telsey") served as an underwriter on the SPO.

63.    Co-lead book-running managers of the SPO, Goldman Sachs and Citigroup, are both headquartered in this District and conducted the SPO out of their offices in this District as representatives of the other Underwriter Defendants. Pursuant to the Securities Act, the Underwriter Defendants are liable for the false and misleading statements in the Registration Statement.

64.    The Underwriter Defendants are investment banking houses that specialize in, *inter alia,* underwriting public offerings of securities. They served as the underwriters of the SPO and

shared more than $33.5 million in fees collectively. The Underwriter Defendants met with potential investors and presented favorable information but materially untrue or materially misleading information about the Company, its operations and its financial prospects or omitted to disclose material information required to be disclosed under the federal securities laws and applicable regulations promulgated under those laws.

65.    Representatives of the Underwriter Defendants also assisted Bumble and the other Defendants in planning the SPO, and were required to conduct an adequate and reasonable investigation into the business and operations of the Company, an undertaking known as a "due diligence" investigation.   The due diligence investigation was required of the Underwriter Defendants in order to engage in the SPO.   During the course of their "due diligence," the Underwriter Defendants had continual access to confidential corporate information concerning Bumble's operations and financial prospects.   A reasonable investigation into the truthfulness and accuracy of the SPO Offering Documents, including the documents and statements incorporated by reference, would have revealed that the SPO Offering Documents contained untrue and misleading statements and omissions, as alleged herein.   None of the Underwriter Defendants made a reasonable investigation into the truthfulness and accuracy of the SPO Offering Documents.

66.    Each Underwriter Defendant purchased the shares of common stock it had agreed to purchase (*see infra*), as well as its allocable shares attributed to an option granted to the underwriters to purchase an additional 2,700,000 shares of common stock in the SPO.   The below chart sets forth the number of shares purchased by each Underwriter Defendant in the SPO:

| Underwriters | Number of Shares |
|---|---|
| Goldman Sachs & Co. LLC | 4,841,250 |
| Citigroup Global Markets Inc. | 4,841,250 |
| Morgan Stanley & Co. LLC | 2,550,000 |
| J.P. Morgan Securities LLC | 2,550,000 |
| Evercore Group L.L.C. | 450,000 |
| Jefferies LLC | 450,000 |
| RBC Capital Markets, LLC | 450,000 |
| Blackstone Securities Partners L.P. | 1,020,000 |
| BMO Capital Markets Corp. | 105,000 |
| BTIG, LLC | 105,000 |
| Cowen and Company, LLC | 105,000 |
| Mizuho Securities USA LLC | 105,000 |
| Raymond James & Associates, Inc. | 105,000 |
| Stifel, Nicolaus & Company, Incorporated | 105,000 |
| SMBC Nikko Securities America, Inc. | 37,500 |
| AmeriVet Securities, Inc. | 22,500 |
| C.L. King & Associates, Inc. | 22,500 |
| Drexel Hamilton, LLC | 22,500 |
| Loop Capital Markets LLC | 22,500 |
| R. Seelaus & Co., LLC | 22,500 |
| Samuel A. Ramirez & Company, Inc. | 22,500 |
| Siebert Williams Shank & Co., LLC | 22,500 |
| Telsey Advisory Group LLC | 22,500 |
| Total: | 18,000,000 |

## IV.    SUBSTANTIVE ALLEGATIONS

67.    As set forth below, Bumble's road to becoming a publicly traded company was paved by Blackstone, the investment management behemoth with nearly $1 trillion in assets under management and a private equity business that alone has more than a quarter of a trillion dollars assets under management.  In 2020, Blackstone bought a majority stake in Bumble for $2 billion. With that majority stake, Blackstone owned more than 90% of Bumble's Class A Common Stock prior to Bumble's IPO, and held more than 87% of the voting power.  In short, Blackstone controlled Bumble, alongside the Company's co-founder, Defendant Herd.  With that control, Blackstone and Herd had the power to hand-pick members of the Bumble Board of Directors and dictate the governance of the Company, while receiving crucial, non-public information about the Company's prospects.  Blackstone also had the right to demand a secondary offering of Bumble

stock, which is what it did seven months after the Company went public and three weeks prior to the end of a 2021 third quarter that saw an abrupt reversal in Bumble's growth.

68.     Armed with inside information and the power to demand an offering of Bumble securities, Blackstone required Bumble to conduct a follow-on secondary offering a few months after the IPO—*i.e.,* the SPO conducted in September 2021.  In the SPO, Blackstone cashed out more than 20 million shares and pocketed $1.1 billion—more than half of its original investment.  As Defendants explained to investors, the "secondary offering was for the sole benefit of our majority shareholder [*i.e.*, Blackstone], and Bumble Inc. did not receive any proceeds from the transaction."

69.     As detailed herein, the SPO was conducted pursuant to the SPO Offering Documents, which misrepresented and omitted the truth concerning Bumble's growth and paying user growth, including by *inter alia* touting a purported increasing propensity for users to pay, misleadingly reporting stale paying user metrics, and presenting risks regarding a decline in paying users as merely hypothetical possibilities.  In reality, at the time of the SPO, Bumble had experienced a material reversal of fortune, as its paying users had already declined, driven primarily by an abrupt decline in paying users of the Badoo App.  This truth was not revealed to investors until shortly *after* Blackstone had pocketed over a billion dollars in the SPO.

A.      **Relevant Background**

        1.      **Bumble's Business**

70.     Defendant Bumble is an operator of two online dating platforms: (i) the Bumble app ("Bumble App"); and (ii) the Badoo app ("Badoo App").  The Bumble App, launched in 2014, requires women to make the first move by reaching out to men.  Bumble is a dating app that does the bulk of its business in the United States, the United Kingdom, Australia and Canada.  The

Badoo App, launched in 2006, does the bulk of its business in Europe and Latin America and is available in 73 countries as of July 31, 2021.

71.     Bumble offers two types of memberships to users—free and "Premium."  While all members have access to certain aspects of both of the dating apps, only Premium members pay subscription fees and additional fees for certain "Premium Services" that are supposed to enhance members' experience on the apps.  Selling Premium memberships to "paying users" is how Bumble monetizes its apps.  Bumble also receives some advertising and partnership revenue, which it characterizes as "not a significant part" of its business.  At the time of the SPO, Bumble was not profitable and, as such, it was critically important to investors that Bumble continue to grow its paying user base across its two dating apps so that the Company could eventually become profitable.

72.     Defendant Herd co-founded Bumble with Andrey Andreev, a Russian billionaire whose initial $10 million investment in the Company ultimately became a 59 to 79 percent stake in Bumble.  Andreev also founded Badoo.  Bumble and Badoo were part of parent company MagicLab, which changed its name to Bumble in July 2020.

73.     A July 2019 investigation by *Forbes* described a "Byzantine corporate culture" at Badoo, plagued by "sex, drugs, misogyny and sleaze" and a London headquarters that was "clearly toxic, especially for women."  The investigation included accounts from 13 former employees who described a misogynistic culture at the London headquarters of Badoo.

74.     Following the *Forbes* report, in late 2019 Andreev sold the entirety of his stake in Badoo and Bumble's parent company to Blackstone.

2.    **Blackstone Acquires A Controlling Interest in Bumble**

75.    On November 8, 2019, Blackstone announced that it would take control of Bumble, pouring in $2 billion of cash to buy a majority stake in the Company.  Blackstone's acquisition was consummated on January 29, 2020.

76.    Blackstone's control over Bumble was solidified through *inter alia* two key agreements:  a Stockholder Agreement dated February 10, 2021 and a Registration Rights Agreement dated February 10, 2021.

77.    **The Stockholders Agreement**:  Through the Stockholders Agreement, Blackstone and its affiliates obtained extensive rights to control Bumble, including through broad rights to designate directors on Bumble's Board, including a majority depending on Blackstone's holdings, and sweeping rights to obtain information regarding Bumble's operations and finances.  For example, the Stockholders Agreement provided *inter alia* that:

(a)    Blackstone had the right to designate directors to Bumble's Board of Directors, including a majority of the directors based on Blackstone's level of ownership of Bumble's total outstanding securities;

(b)    Blackstone also had the right to designate one non-voting observer to attend meetings of the Board;

(c)    Blackstone's designated directors were immune from being removed from the Board unless Blackstone consented;

(d)    Blackstone had the right to "review the books and records of the Company" and to "discuss the affairs, finances and condition of the Company . . . with the officers of the Company";

(e)    Blackstone would be provided, upon request, "operating and capital expenditure budgets and periodic information packages relating to the operations and cash flows of the Company";

(f)    Blackstone's designees to the Board were permitted to "share any information concerning the Company . . . received by them from or on behalf of the Company" with Blackstone or Herd;

> (g)    Blackstone had to consent, in writing, to any increase or decrease in the total number of directors on Bumble's Board;
>
> (h)    The Stockholders Agreement could only be modified or amended with the written approval or both the Company and the Principal Stockholders, including Blackstone; and
>
> (i)    Blackstone had to consent to certain amendments to Bumble's charter or bylaws.

78.    Further, the Stockholders Agreement required Blackstone and Herd to support the election of one another's designees and to agree not to seek to remove or replace them.  Designees to the Board, therefore, could only be removed with the consent of the Principal Stockholder who designated them.

79.    As of the SPO, Bumble's Board consisted of 11 voting members.  Of those voting members, six were affiliated with or have strong ties to Blackstone: four are Blackstone executives (Anderson, Bavishi, Korngold, and Morgan); one, Amy Griffin, was invited to invest in Blackstone's investments in Spanx and Supergoop; and the final, Defendant Herd, has benefitted significantly from Blackstone's financial largesse.  Specifically, Herd received a $125 million payout when Blackstone first acquired Bumble shares, and Blackstone forced Bumble to make a $119 million, low-interest loan to a partnership controlled by Herd (Beehive Holdings III, LP).  That loan had a 1.93% interest rate and was made in connection with the closing of Blackstone's acquisition of its controlling stake in Bumble.

80.    **The Registration Rights Agreement**:    Through the Registration Rights Agreement, Blackstone and its affiliates obtained sweeping rights to cause Bumble to sell shares to the investing public, at the Company's expense.  For example, the Registration Rights Agreement provided *inter alia*:

> (a)    Blackstone had the right to demand public offerings of Bumble stock, including a non-shelf registered offering, or to be included in or "piggyback" on other registered offerings;

(b)    Bumble would provide Blackstone and its counsel with copies of any registration statement, prospectus, free writing prospectus, and amended versions of those documents—or any documents incorporated therein by reference;

(c)    Bumble would "fairly consider such reasonable changes in such documents" proposed by Blackstone's counsel; and

(d)    Bumble would make available Company representatives to Blackstone "for discussion of such documents" if requested.

81.    Further, the Registration Rights Agreement gave Blackstone the right to select the managing underwriters for the offering, select the provider of capital markets advisory services (including affiliates of Blackstone), select counsel for the selling investors (including the same as counsel for the Company), and determine the plan of distribution.

82.    In February 2021, immediately prior to going public, Bumble amended and restated its Charter to, among other things, create distinct Class A and Class B shares of common stock. The amended Charter took the unusual step of distinguishing between Class A stock owned by Herd or Blackstone, and Class A stock generally.  While Bumble's Class A common stock typically entitles shareholders to one vote per share, the Charter provided that Herd or Blackstone would be entitled to ten votes per share until a defined termination date was reached.  That termination date is the earlier of February 2028 (the seventh anniversary of Bumble's IPO) or such date that Herd and Blackstone own in the aggregate less than 7.5% of the Class A common stock outstanding.

83.    Bumble's Class B common stock provided no economic rights, but holders are entitled to votes equal to the number of Common Units the shareholder holds, regardless of the number of shares of Class B common stock held by the shareholder.  As with the Class A common stock, the Principal Stockholders holding Class B common stock are uniquely entitled to a number of votes equal to ten times the aggregate number of Common Units held.

84.     The ten-to-one voting ratio between Bumble's Class A and Class B common stock held *solely* by the Principal Stockholders gave Blackstone and Herd overwhelming control over Bumble.  As the Company stated in its Annual Report on Form 10-K for the fiscal year ended December 31, 2020, filed on March 15, 2021 ("FY20 10-K"), "[T]he Principal Stockholders collectively control a majority of the combined voting power of our common stock and therefore are able ***to control all matters submitted to our shareholders***."  (Emphasis added.)

85.     In addition to the outsize power and influence Blackstone had over corporate matters at Bumble, Blackstone also possessed the unusual ability—shared only with Defendant Herd—to force Bumble to make a secondary offering.

86.     On its public website, Blackstone boasts that it "partnered with Bumble" and "buil[t] a senior leadership team at Bumble."  Blackstone's website also states that what made Blackstone "stand out" in Defendant Herd's view was its "team's ability to offer not only capital, but also access to Blackstone's full suite of operational resources."[2]

87.     Moreover, certain of the Blackstone Defendants, including for example Blackstone Buzz Holdings, were parties to a Support and Services Agreement with Bumble.  This agreement provided that Blackstone's "Portfolio Operations" group was to provide "hands-on support" to Bumble to help it become "more productive, efficient and valuable," including operational support, which was defined as "Ops Support."  Pursuant to the Support and Services Agreement, Bumble agreed "to accept the amount and type of Ops Support as may be determined by [Blackstone's] Portfolio Operations group, in its sole discretion."

---

[2]  *See, e.g.*,   https://www.blackstone.com/insights/article/bumble-ceo-whitney-wolfe-herd-on-partnering-with-blackstone-growth-bxg/ (last accessed October 3, 2022).

88.     As demonstrated by Blackstone's website, a key aspect of Blackstone's Portfolio Operations group's services is "Data Science," which "us[es] advanced analytics and statistical methods to improve how we invest, operate and build businesses alongside our companies, allowing them to use data as a strategic and operational lever."[3]  Indeed, Blackstone's website elaborates that its data science team, as "part of the firms' Portfolio Operations group … work[s] hand-in-hand with management teams … to build more valuable businesses and accelerate growth."[4]  Blackstone further describes its data science team as "a team of data scientists, strategists and engineers that uses data to 'move the needle' with our portfolio companies"—like Bumble here—by "analyzing complete datasets, developing predictive and analytical models and helping the firm use data more effectively."[5]  This confirms Blackstone's direct involvement in and possession of Bumble's operational data, including key operating metrics like paying users for the Badoo App and the Bumble App, and suggests that Blackstone was privy to, essentially, a constant stream of operational data from Bumble.

### 3.     Blackstone and Herd Quickly Take Bumble Public Through An IPO

89.     In February 2021, Defendants Herd and Blackstone took Bumble public through an IPO in which the Company raised more than $2.4 billion from investors.

90.     Defendants Herd and Blackstone took Bumble public through an "Up-C" structure. Under this structure, Bumble, as a publicly traded holding company, holds common units of the Company's operating limited partnership.

91.     Upon the completion of the IPO, Defendants Herd and Blackstone beneficially owned approximately 96% of the combined voting power of Bumble's Class A and Class B

---

[3] *See, e.g.,* https://www.blackstone.com/our-businesses/portfolio-operations/ (last accessed October 3, 2022).

[4] *Id.*

[5] *Id.*

common stock.  Further, according to a *Forbes* article dated February 21, 2021 titled "The Bumble IPO And Blackstone's Private Equity Gold Mine," Blackstone's "initial investment" of $2 billion had by the time of the IPO, "already returned about $2.3 billion in cash due to dividends and proceeds from Bumble's offering."[6]

92.     Defendant Herd's and Blackstone's beneficial ownership of over 96% of the combined voting power rendered Bumble a "controlled company" under NASDAQ corporate governance standards.  As a controlled company, Bumble was exempt from certain corporate governance standards, including the requirements (1) that independent directors make up a majority of its board of directors, (2) that director nominations be made, or recommended to, Bumble's full board of directors by either its independent directors or by a nominations committee comprised entirely of independent directors, and (3) that Bumble adopt a written charter or board resolution addressing the nominations process.

93.     The Stockholders Agreement also gave Defendant Herd and Blackstone and its affiliates—collectively, the "Principal Stockholders"—outsized voting rights.  For example, each share of Class A common stock held by a Principal Stockholders would be worth ten votes, and each Principal Stockholders holding Class B common stock would be entitled to a number of votes equal to ten times the aggregate number of Common Units of Bumble Holdings held by the Principal Stockholder.  These outsized voting rights would exist until seven years from the IPO's close, or, if earlier, the date the parties to the Stockholders Agreement cease to own in the aggregate 7.5% of the outstanding shares of Class A common stock.

---

[6] https://www.forbes.com/sites/antoinegara/2021/02/12/the-bumble-ipo-and-blackstones-private-equity-goldmine/?sh=724a4eef6229 (last accessed October 3, 2022).

94.    The IPO Prospectus made clear that paying user growth was central to Bumble's story and its financial prospects, stating for example that, "The size of our user base and our users' level of engagement are ***critical to our success.***"  The IPO Prospectus also identified growth in paying users as the most crucial metric for Bumble's success.  Indeed, Bumble identified two categories of "key operating metrics": (1) paying users (broken down between the Bumble App and the Badoo App), and (2) average revenue per paying user.

95.    Analyst commentary around the time of Bumble's IPO emphasized the Company's growth potential, particularly among paying users.  For example, on March 8, 2021, a J.P. Morgan analyst report projected "[international] payers to increase from 25% of total in 2020 to 35-40%" in 2023.  J.P. Morgan also expected the Company's revenues to grow rapidly, "driven by ***Bumble app growth of 30%***" and "***Badoo & Other growth of 10%.***"  Within the projected 30% growth for the Bumble App, J.P. Morgan anticipated that it would be dominated by growth in paying users— "***26% Payer growth*** and 3% ARPU growth."  J.P. Morgan also projected that paying user growth would dictate the *entirety* of Badoo App growth: "We expect Badoo & Other growth of +10% CAGR [compound annual growth rate] from 2020-23E, ***driven by Payer growth of +10%*** and ARPU growth of +0%."

96.    J.P. Morgan also noted that "Badoo monetizes some non-paying male users through video and banner advertising," and that advertising revenue was $16 million in 2019, an estimated $14 million in 2020, and projected advertising revenue of $18 million in 2023.

97.    Following its IPO, Bumble claimed that it was experiencing significant paying user growth.  The Company announced year-over-year increases of 32% (to 2.69 million) by the end of the fourth quarter of fiscal 2020 (ended December 31, 2020), 30% (to 2.80 million) by the end of the first quarter of 2021 ("1Q21") (ended March 31, 2021), and by another 20% (to 2.93 million)

by the end of the second quarter 2021 ("2Q21") (ended June 30, 2021). In its IPO Prospectus, Bumble reported having 42.1 million "monthly active users," and as of June 30, 2021, Bumble claimed 2.93 million "paying users" (1.47 million on the Bumble app and 1.45 million on the Badoo app). Bumble added more than 100,000 paying users in each of the first and second quarters of 2021.

**B.      Bumble's Growth Falters As Overall Paying Users Decline In The Third Quarter of 2021, Driven By Significant Declines In Badoo Paying Users**

98.     Unbeknownst to investors, by the third quarter of 2021 ending September 30, 2021 ("3Q21"), the Company's previously favorable paying user growth trend had abruptly reversed. During the quarter, as Defendants were later forced to admit, Bumble had actually lost ***over 60,000 paying users*** between its two apps. Specifically, the number of paying users on the Badoo App ***declined*** quarter over quarter from 1.45 million paying users in 2Q21 to 1.33 million paying users in 3Q21—a decline of approximately 120,000 paying users. Further, with respect to the Bumble App, the paying user growth slowed materially—increasing from 1.47 million paying users to only 1.53 million paying users.

99.     These challenges were specific to Bumble. The Company's biggest competitor, Match.com, saw paid user growth during that same quarter and reported its highest-ever net additions. Match.com's paying user base grew by 1.3 million paying users.

100.    Indeed, by Bumble's own admissions, the negative trends were directly related to its own actions. For example, Defendants later explained that the Badoo App suffered during 3Q21 as a result of the Company's temporary disabling of third-party payment options on Android, done in preparation for moving payments to its platform. Further, Bumble increased pricing too much, reducing the propensity of users to become paying users.

101.    Former Bumble Employee No. 1 ("**FE-1**") worked as a director in Bumble's marketing organization in the United Kingdom from October 2019 through October 2021.  FE-1's role was primarily operational and included a lot of governance framework, approval framework and global strategies that could be leveraged for a lot of different teams.  For example, FE-1 was closely involved in annual planning for the global marketing budgets.  FE-1 also did some work on Badoo involving approval framework.  FE-1 stated that the Company used an internally built system for tracking user metrics, called MicroStrategy.[7]  These metrics included Monthly Average Users (MAU), Daily Average Users (DAU) and churn rate.

102.    According to FE-1, there was a decline in growth in the U.S. market that was absolutely discussed in meetings, including in pretty explicit terms.  FE-1 said that Chief Marketing Officer, Dominic Gallello was a part of these meetings where the growth decline was discussed.  FE-1 explained that a big part of Bumble's drive for internationalization was because of the "maturing" of the U.S. market, which had been a big revenue driver.  FE-1 reported that they were approaching penetration in the U.S. market.

103.    FE-1 stated that FE-1 and colleagues had some frustrations with management because they felt management was not acknowledging the reasons for the challenges marketing was facing in the U.S.  According to FE-1, the original mechanism Bumble launched on was outdated, and the Company had not innovated.  So FE-1 and colleagues were frustrated that was

---

[7] The fact that Bumble used MicroStrategy is confirmed by a recent job offer posting online by Bumble for the position of "Reporting Analytics—Platform Architect," which identifies as a "Key Accountabilit[y]" for the position to "Define and own the architecture of the MicroStrategy platform."  *See, e.g.,* https://talentdoor.jobboardfire.com/reporting-analytics-platform-architect-5cbed46078f0 (last accessed October 6, 2022).  Likewise, a job posting for a position as "Senior Reporting Analytics Developer" at Bumble in Austin, Texas stated "Our main tool of choice is Microstrategy, used across the business to democratise data."  *See e.g.,* https://jobs.girlboss.com/senior-reporting-analytics-developer-65354291d115 (last accessed October 6, 2022).

not being addressed by executive management. According to FE-1, the message from executives was that the slowdown in growth was due to the natural maturity of markets.

104. FE-1 reported that there were definitely conversations at the Company about how organic growth—*i.e.*, registrations not from paid advertising—was slowing, which they internally attributed to a significant lack of marketing in the U.S. With Badoo, according to FE-1, marketing did not have the budgets to make a big impact.

105. Former Bumble Employee No. 2 ("**FE-2**") worked as a Global Integrated Marketing Lead at Bumble in the United Kingdom from June 2021 to September 2021. FE-2 reported being hired to integrate the various marketing campaigns across Europe and help with marketing processes with the goal of having a global narrative that fed through all markets.

106. FE-2 described the Company as being an "absolute shambles" and a "sh*t show." FE-2 explained that Badoo's reputation with consumers was not great and that Badoo was not growing. Indeed, FE-2 said that growth was non-existent at Badoo. This was based on customer registrations and returning customers. According to FE-2, Badoo has paying options, but the majority of users are using it as a free app. FE-2 further explained that it was clear from the numbers that Badoo was struggling. FE-2 also stated that marketing for Badoo did not have big budgets, so it was difficult to do much effective marketing. Further, according to FE-2, Badoo did not even have targets for growth, so the topic was treated like a joke. FE-2 reported that the Company held all-hands and town hall meetings that combined Badoo and Bumble employees— but Badoo did not get much attention at these meetings from Company executives. FE-2 recalled discussing with Badoo's Chief Marketing Officer, Dominic Gallello, that Badoo was in decline. According to FE-2, Mr. Gallello said that it was because Badoo was in decline that they needed a new marketing plan. FE-2 reported that these discussions happened in July and August 2021.

107.    Former Bumble Employee No. 3 ("**FE-3**") worked as a Data Analyst at Bumble in the United Kingdom from February 2018 to May 2021.  FE-3's role involved app engagement and product analysis on the data team, which FE-3 said interacted with almost all of the other teams at Bumble, including product managers, user research, development and some revenue teams.  FE-3 reported that the data team was split between data analysts and reporting.  The reporting team tracked all the metrics, including engagement, some revenue metrics, average revenue per user and daily active users.  Everyone on the data team could see what metrics were being tracked.  On the data analyst side, they would rotate every six months to a different area, such as safety, revenue, or new users.  According to FE-3, the metrics were tracked on the data side using a tool called "hot panel," which was an in-house tool.  FE-3 said that, while most companies have external tools they use, Badoo and Bumble built their own tool—the hot panel—that would track clicks and views.

108.    Bumble closely tracked key operating metrics like paying users for both its Badoo App and Bumble App, as well on a Company-wide basis.  Indeed, Bumble's Form 10-Qs filed with the SEC identified the Company's reported "Badoo App and Other Paying User" and "Total Paying Users" figures as "Key Operating Metrics."  Moreover, Bumble's definitions of "Badoo App and Other Paying User" and "Total Paying Users" make clear that the Company tracked each of these metrics on *at least* a monthly basis.  For example, the SPO Offering Documents explained that

> "A 'Badoo App and Other Paying User' is a user that has purchased or renewed a subscription plan and/or made an in-app purchase on the Badoo app in *a given month* (or made a purchase on one of our other apps that we owned and operated in a given month, or purchase on other third-party apps that used our technology in the relevant period).  We calculate Badoo App and Other Paying Users as *a monthly average*, by counting the number of Badoo App and Other Paying Users *in each month* and then dividing it by the number of months in the relevant measurement period."

And those materials further explained that: "We define Total Paying Users as the sum of Bumble App Paying Users and Badoo App and Other Paying Users."

109.    Further, Bumble's IPO Prospectus and FY20 10-K expressly stated that Defendants "regularly review metrics, including our Bumble App Paying Users, Badoo App and Other Paying Users, Total Paying Users, Bumble App ARPPU, Badoo App and other ARPPU and Total ARPPU metrics to *evaluate growth trends, measure our performance, and make strategic decisions*."

110.    As such, by the time of the SPO, Defendants possessed and, by their own admission, reviewed at least two months and 10 days of data—a significant majority of the quarter—showing that Badoo App Paying Users was in decline and growth in Bumble App Paying Users had slowed.  This included Blackstone, who had negotiated to receive key operating information like paying user metrics in the Stockholders Agreement and was providing operational services, including data analysis, to Bumble.

**C.    Blackstone Causes Bumble to Conduct the SPO Pursuant to Materially Misleading Offering Materials**

111.    On or about September 10, 2021—less than seven months after it first went public and just a few weeks before the end of its 3Q21—Bumble undertook another registered public stock offering.  In the SPO, Bumble did not raise any capital or sell any shares.  Instead, the SPO allowed controlling shareholder Blackstone to sell 20.7 million shares of Bumble Class A common stock at $54 per share, generating more than $1.1 billion in gross proceeds.  As Defendants explained, this "follow-on secondary offering was for the sole benefit of our majority shareholder [*i.e.,* Blackstone], and Bumble, Inc. did not receive any proceeds from the transaction."

112.    On or about September 7, 2021, Bumble filed with the SEC a Registration Statement on Form S-1 for the SPO. On September 9, 2021, the SEC declared the Registration Statement effective, and on or about September 13, 2021, Bumble filed the final Prospectus for

the SPO, which forms part of the Registration Statement (collectively, the "SPO Registration Statement" or the "Registration Statement").  The SPO Registration Statement also incorporated by reference the following SEC filings:

(a)    The Company's Annual Report on Form 10-K for the fiscal year ended December 31, 2020, filed on March 15, 2021;

(b)    The Company's Quarterly Reports on Form 10-Q for the quarters ended March 31, 2021 and June 30, 2021, filed on May  17, 2021 and August 13, 2021, respectively;

(c)    The Company's Current Reports on Form  8-K filed on February  16, 2021 and June 25, 2021; and

(d)    The description of the Company's shares of Class A common stock contained in its Registration Statement on Form 8-A filed on February 11, 2021, including all amendments and reports.

(collectively, the "SPO Offering Documents").

113.    The SPO Offering Documents, including the SPO Registration Statement, were negligently prepared and, as a result, contained untrue statements of material facts or omitted to state other facts necessary to make the statements made therein not misleading—and were not prepared in accordance with the rules and regulations governing their preparation.  Critically, in the SPO Offering Documents, Defendants misleadingly touted Bumble's growth and increasing paying users.  For example, Defendants boasted of the "increasing propensity for users to pay," that they "expect to increase paying users," and that its community was "growing," citing to statistics showing a nearly 25% increase in Total Paying Users.  The Offering Documents also presented risks to Bumble's increasing paying users as mere hypothetical possibilities, stating, for example, that "at some point we *may* face challenges increasing our Paying Users" and "*if* … users … do not convert to paying users, our revenue, financial results and business *may* be significantly harmed."

114.    Further, under the rules and regulations governing the preparation of the Registration Statement, Defendants were required to disclose the problems plaguing the Company's Bumble App and Badoo App and the resulting adverse impacts to the Company's paying user base.  The SPO Offering Documents, however, did not contain these disclosures. Pursuant to Item 303 of Regulation S-K, 17 C.F.R. §229.303, and the SEC's related interpretive releases thereto, issuers are required to disclose events or uncertainties, including any "known trends," that have had or are reasonably likely to cause the registrant's financial information not to be indicative of future operating results.  At the time of the SPO, growth in Bumble's overall paying user count and in the Badoo App's paying user count had declined significantly during 3Q21—and growth had slowed in the Bumble App's paying user figures.  The adverse events and uncertainties associated with these declining trends were reasonably likely to have a material impact on Bumble' profitability, and, therefore, were required to be disclosed in the Registration Statement.

115.    The SPO was successfully completed by Defendants, enabling Blackstone to sell 20.7 million shares of Blackstone's Bumble Class A common stock to the public at $54 per share, generating more than $1.1 billion in gross proceeds.

D.    **The Truth Concerning Bumble's Slowing and Declining Growth And Paying User Growth Begins to Emerge**

116.    On November 10, 2021, Bumble announced its 3Q21 financial results.  The Company disclosed that, rather than growing paying users, the Company's total paying user count had actually ***declined*** to 2.86 million, well below the Company's 2.9 million reported paying users as of June 30, 2021 as highlighted in the Registration Statement.  This overall decline was driven by a significant decline in Bumble's "Key Operating Metric" line item titled "Badoo App and Other Paying Users," which fell to 1.3334 million in 3Q21—a quarter-over-quarter decline from

1.4543 million in 2Q21 and a year-over-year decline from 1.4577 million in 3Q20.  Further,

Bumble reported that this decrease caused its "Badoo App and Other" revenue line item to fall to

$58 million in 3Q21 from $59.7 million in 3Q20.  Growth also slowed in the Bumble App's Paying

User numbers.

117.    Further, during Bumble's 3Q21 earnings conference call, Defendant Subramanian

(Bumble's CFO) stated: "Badoo App and other revenue totaled $58 million, down $1.7 million or

3% year-over-year.  In Q3, we saw a 9% year-over-year decrease in paying users to 1.3 million."

118.    Both Defendants Herd and Subramanian attributed the revenue and paying user

declines to COVID-related headwinds, including erosion in desktop and mobile web usage that

"accelerated during COVID," and Bumble's decision to disable certain payment mechanisms on

the Android platform.  For example, Defendant Subramanian stated:

> As you heard just now from Whitney [Defendant Herd], the decline in paying users
> primarily reflects the headwinds in some geographic and demographic markets that
> have been more impacted by COVID and continued erosion in desktop and mobile
> web usage.  Paying users were also impacted for part of Q3, where we disabled
> certain payment mechanisms on the Android platform.

119.    In addition, each of Bumble's Total Paying User figure, the Bumble App's Paying

User figure and the Badoo App's Paying User figure for 3Q21 fell short of analyst consensus

expectations.  For example, analysts at RBC wrote a report titled "Sub miss overshadows

monetization narrative; Lowering Price Target" which stated that "the company missed total paid

subs by 5.9%, with Bumble and Badoo being 1.9% and 11.3% shy of expectations, respectively"—

and then lowered RBC's price target by $10 "on a lower multiple due to lower sub add forecasts."

The RBC report included a chart depicting that:

> (a)    the Bumble App missed RBC and Street expectations for paying users by
>        4.1% and 1.8%, respectively;
>
> (b)    the Badoo App missed RBC and Street expectations for paying users by
>        7.4% and 11.1%, respectively; and

> > (c)     "Badoo and Other" Revenue missed RBC and Street expectations by 1% and 2.5% respectively.

RBC also stressed the importance of the "volume metric," which RBC "believe[s] investors value … more than pricing."

120.    Other analysts were concerned by Bumble's November 10, 2021 disclosures.  For example, analysts at BMO Capital Markets observed that "Badoo payer growth is feeling the brunt *of lagging propensity to pay* throughout COVID-effected regions, and less-than-timely tests removing 3P payments options on Android/Play during the quarter (since returned)."  BMO, which had estimated that Badoo App users would grow by 30,000 users, revised its estimates to "forecast Badoo payers to decline sequentially" owing in part to "*lagging propensity to pay* as COVID recovery still takes hold."  The BMO analysts also noted that Bumble App "Payers" missed both BMO and consensus estimates, as did Badoo "Payers" for 3Q21.

121.    Analysts at Wolfe Research noted that the decline on total paying users "missed consensus estimates by 6%."  The Wolfe Research report added that Badoo App revenues "declined 3%" and paying Badoo App users fell 8%, "missing consensus estimates by 4% and 10%, respectively."

122.    Evercore ISI's analyst similarly noted the sudden decline in Badoo App paying users, stating in a section of the report titled "Badoo Trends" that "Badoo and Other revenue came in at $58MM, down -3% Y/Y" and "Badoo Payers declined 8.5% Y/Y, *coming in well below Street estimates*, large[ly] due to Bumble's decision to turn off alternative payments on the Android Platform" and "also faced modest COVID-related headwinds."  Evercore further explained that one of two "key points" for the quarter was that there was "some weakness at Badoo" due to a "meaningful (greater-than-expected) loss in Payers in the quarter."

123.    Jefferies analysts stated that a "key takeaway" for the Company's 3Q22 earnings was that Bumble reported "a mixed Q3 with unexpected weakness at Badoo (27% of rev)" and noted that "Badoo rev and payers both declined in Q3 with issues potentially lingering into Q4." Jefferies also lowered its price target for Bumble.

124.    Bumble's disclosures on November 10, 2021 caused the price of Bumble Class A common stock to decline substantially and precipitously.  Indeed, in response to these disclosures, Bumble's stock fell from a close of $47.75 on November 10, 2021 to a close of $38.56 on November 11, 2021—a dramatic single-day decline of 19.25% on extremely heavy trading volume—and then fell to a close of $36.55 on November 12, 2021—another 5.21% decline on elevated trading volume.

E.    **Subsequent Developments**

125.    Badoo App paying user figures have stayed relatively flat to the low 3Q21 numbers and/or continued to decline.  For example, in the fourth quarter of 2021, the Company reported 1.338 million paying users for the Badoo App, essentially flat from the 1.333 million in the 3Q21. Then, in the first quarter of 2022, the Company reported that Badoo App paying users fell sharply again, to 1.232 million.  In the second quarter of 2022, Badoo App paying users fell yet again to 1.096 million.

126.    Similarly, Badoo App revenue—which peaked in the second quarter of 2021 and began to decline in the 3Q21—has since continued to decline.  For example, Badoo App revenue fell to $57.7 million in the fourth quarter of 2021, and then to $55.8 million and to $50.8 million in the first and second quarters of 2022, respectively.

127.    Through the months following the November 10, 2021 disclosures, Bumble's stock price continued to decline overall.  Indeed, on January 24, 2022, the date of the initial complaint filed in this action, Bumble's Class A common stock closed at $29.45 per share—a 45.46% drop

Case 1:22-cv-00624-DLC    Document 42    Filed 10/07/22    Page 41 of 56


from the SPO offering price of $54 per share and a 38.32% drop from the price of Bumble stock prior to November 10, 2021.

## V.    DEFENDANTS' MATERIALLY FALSE AND MISLEADING STATEMENTS AND OMISSIONS IN THE SPO OFFERING DOCUMENTS

### A.    <u>Misstatements and Omissions About Growth And Increasing Paying Users</u>

128.    The Company's SPO Offering Documents included misrepresentations about the Company's purported growth and increasing paying users.  For example, the SPO Registration statement stated:

> As **our community continues to grow, user engagement and monetization increase. These increases** enable us to reinvest in product innovation and marketing and, in turn, attract more people to our platform.
>
> *            *            *
>
> **Our financial model is characterized by a rare combination of growth**, scale, strong profitability and cash flow generation. Both the Bumble and Badoo apps monetize via a freemium model where the use of our service is free and a subset of our users pay for subscriptions or in-app purchases to access premium features.

129.    In its SPO Registration Statement, the Company boasted of its "large, growing and engaged community," emphasizing outdated paying user figures to portray the Company as experiencing continued growth in paying users:

> A Large, **Growing, Engaged Community**. We have created **a large, growing and engaged community with approximately 2.9 million average Total Paying Users as of June 30, 2021, up 24.9% from June 30, 2020**.

130.    The SPO Registration Statement also touted under the heading "Our Growth Strategies" that users were increasingly likely to pay for the online dating, stating for example:

> **We see significant upside in our core online dating market** driven by the steady growth of the global singles population, increasing adoption of online dating and **increasing propensity for users to pay**.

The same or substantially the same statement was made in other documents included within the SPO Offering Documents, including for example the Company's FY20 10-K.

131.    Bumble's SPO Registration Statement also discussed the Company's "strategies"—where the Company touted the "Increasing Monetization" of its dating apps, which it described as a "primary driver[] of market growth."  The Company characterized itself as "still early in [its] monetization journey," and stated that it expected to increase paying users going forward:

> We are still early in our monetization journey and **expect to increase paying users and average revenue per paying user over time**.  We will develop new monetization features and improve existing features in order to increase adoption of in-app purchases and our subscription programs.

132.    The SPO Registration Statement also misleadingly emphasized that Bumble had experienced material growth in "total paying users" leading up to the SPO.  For example, the Registration Statement stated that the Bumble App saw sharp growth, from 0.574 million paying users as of December 31, 2018, which grew to 0.856 million paying users as of December 31, 2019, 1.14 million users as of December 31, 2020, and 1.41 million paying users as of June 30, 2021.  As to the Badoo App, the Registration Statement stated that paying users grew from 1.13 million paying users as of December 31, 2018, to 1.19 million paying users as of December 31, 2019, 1.36 million paying users as of December 31, 2020, and 1.45 million paying users as of June 30, 2021.

133.    The above statements were materially false and misleading because they misrepresented *inter alia* the fact that, at the time of the SPO, the Company was experiencing decreased growth, including decreased Total Paying Users and Badoo App Paying Users and revenue, as well as declining growth in Bumble Paying Users, including due in part to Bumble's own actions.  For example, the Company misrepresented and failed to disclose that: (i) Bumble overall lost tens of thousands of paying users during the third quarter of 2021 ("3Q21"); (ii) the Badoo App lost approximately 120,000 paying users during 3Q21 and suffered quarter-over-

quarter revenue declines; (iii) Bumble App paying users growth slowed during 3Q21; (iv) paying users were leaving the Badoo App, or could not make payments through the Badoo App, due to problems caused by the Company's transitioning its payment platform; and (v) these undisclosed facts undermined the Company's expectations of "increas[ing] paying users," the "increasing propensity for users to pay," and the continued growth of paying users, a substantial weakening of Bumble's business metrics and financial prospects that was not represented in the SPO Registration Statement.

      **B.**    **Misstatements and Omissions Presenting Risks As Mere Hypothetical Possibilities When They Had Already Materialized**

134.    The SPO Offering Documents also included materially misleading statements presenting risks to the Company's growth and paying user growth as well as the risks posted by the COVID-19 pandemic as mere hypothetical or theoretical possibilities when those risks had already materialized.  For example, the SPO Offering Documents stated:

> **If** we fail to retain existing users or add new users, or **if** our users decrease their level of engagement with our products or **do not convert to paying users**, our revenue, financial results and business **may** be significantly harmed.
>
>           *              *             *
>
> COVID-19 and its variants have continued to impact global economic conditions and consumer confidence and spending in many parts of the world and may continue to do so for some time, which **could materially adversely affect demand, or users' ability to pay,** for our products and services, particularly in the geographic and demographic markets in which Badoo operates.

135.    These misleading risk statements, or substantially similar statements, were also contained in other SPO Offering Documents, including for example, the Company's FY20 10-K, as well as the 10-Q's which referenced the FY20 10-K Risk Factors, and were incorporated by reference into the SPO Offering Documents.

136.    The FY20 10-K, and therefore the SPO Offering Documents, also presented an "erosion" of Bumble's user base or engagement levels as a theoretical possibility that could in the future impact Bumble:

> A number of other online dating companies that achieved early popularity have since experienced slower growth or declines in their user bases or levels of engagement. **There is no guarantee that we will not experience a similar erosion of our user base or engagement levels.** User engagement can be difficult to measure, particularly as we introduce new and different products and services. Any number of factors can negatively affect user retention, growth, and engagement, including **if** . . . users are no longer willing to pay for subscriptions or in-app purchases[.]

137.    In its FY20 10-K, the annual report incorporated into the SPO Offering Documents, Bumble further characterized slowing or decreasing user growth as merely hypothetical:

> **If we are unable to maintain or increase our user base and user engagement**, our revenue and financial results **may be materially adversely affected**. . . . **Any decrease in user retention, growth or engagement could** render our products less attractive to users, which is likely to have a material and adverse impact on our revenue, business, financial condition and results of operations. **If our user growth rate slows or declines**, we will become increasingly dependent on our ability to maintain or increase levels of user engagement and monetization in order to drive revenue growth.

138.    Similarly, the FY20 10-K presented risks to increasing paying user growth specifically as mere hypothetical possibilities:

> Our revenue growth primarily depends on Paying Users. While we believe we are in the early days of our opportunity, **at some point we may face challenges increasing our Paying Users**, including competition from alternative products and a lack of appealing product features. **We may also at some point find that growth in Paying Users slows due to saturation of the online dating market**.

139.    These statements were materially false and misleading because, at the time of the SPO, the risks that Defendants presented as mere hypothetical and theoretical possibilities had materialized.  Specifically, these statements misrepresented and omitted that: (i) overall paying users, and Badoo App paying users and revenue, had declined materially; (ii) the growth of Bumble

App paying users had slowed; and (iii) thus, the risks described in the above statements had already materialized and were adversely affecting the Company's business and financial results.

### C.    Materially False and Misleading Omissions in Bumble's SPO Offering Documents (Item 303)

140.    As discussed below, the SPO Offering Documents, including the SPO Registration Statement, the SPO Prospectus and all SEC filings incorporated by reference therein, failed to disclose information required to be disclosed therein by Item 303  (17 C.F.R. §229.303).

141.    Item 303 of Regulation S-K requires disclosure of Results of Operations, including events, transactions, trends or uncertainties, specifically affecting net sales or revenues or income. For example, Item 303 requires disclosure of "any unusual or infrequent events or transactions or any significant economic changes that materially affected the amount of reported income from continuing operations and, in each case, indicate the extent to which income was so affected." Item 303 further requires disclosure of "any known trends or uncertainties that have had or that are reasonably likely to have a material favorable or unfavorable impact on net sales or revenues or income from continuing operations."

142.    Importantly, the SEC has stated that Item 303 is "intended to give the investor an opportunity to look at the company through the eyes of management by providing both a short and long-term analysis of the business of the company . . . with particular emphasis on the registrant's prospects for the future."  Management's Discussion and Analysis of Financial Condition and Results of Operation, Securities Act Release No. 6835, 1989 WL 1092885, at *3 (May 18, 1989). Thus, "material forward-looking information regarding known material trends and uncertainties is required to be disclosed as part of the required discussion of those matters and the analysis of their effects."  Commission Guidance Regarding Management's Discussion and Analysis of Financial

Condition and Results of Operation, Securities Act Release No. 8350, 2003 WL 22996757, at *11 (Dec. 29, 2003).

143.    Therefore, Item 303 required disclosure in the SPO Offering Documents of the facts that the Company was experiencing decreased growth, decreasing Total Paying Users and Badoo App Paying Users and revenue, as well as declining growth in Bumble Paying Users.  In particular, the SPO Offering Documents were required under Item 303 to disclose *inter alia*: (i) Bumble's declines in Total Paying Users; (ii) the Badoo App's declines in Paying Users and revenues; (iii) the slowdown in paying user growth for the Bumble App; (iv) the Badoo App's loss of paying users, and/or payments, due to problems caused by the Company's transitioning its payment platform; and (v) the lagging propensity of Badoo App and Bumble App users to pay.  Each of these issues represented known events, trends or uncertainties that were reasonably expected to have a material unfavorable impact on the Company's net sales or revenues or income.  Bumble's SEC filings failed to disclose this information and thus failed to comply with Item 303.

## VI.    INAPPLICABILITY OF STATUTORY SAFE HARBOR AND BESPEAKS CAUTION DOCTRINE

144.    The statutory safe harbor and/or bespeaks caution doctrine applicable to forward-looking statements under certain circumstances does not apply to any of the false and misleading statements set forth in this Complaint.  To start, the statements set forth herein are not forward-looking and/or contained mixed statements of purportedly historical or current facts and conditions at the time the statements were made.  Further, many of the specific statements described herein were not identified as "forward-looking" when made.  To the extent that any of the false or misleading statements alleged herein can be construed as forward-looking statements, the statements were not accompanied by meaningful cautionary language identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking

statements. Alternatively, to the extent that the statutory safe harbor does apply to any forward-looking statements described herein, Defendants are liable for those false or misleading forward-looking statements because at the time each was made, the speaker knew that the particular forward-looking statement was false or misleading, and/or that the forward-looking statement was authorized and/or approved by an executive officer of Bumble who knew that those statements were false or misleading when made.

## VII.    CLASS ACTION ALLEGATIONS

145.    Plaintiffs bring this action as a class action pursuant to Fed. R. Civ. P. 23(a) and 23(b)(3) on behalf of a class consisting of all persons or entities who purchased or otherwise acquired the publicly traded Class A common stock of Bumble directly in or traceable to the SPO (the "Class") between September 10, 2021 and January 24, 2022, inclusive, and who were damaged thereby. Excluded from the Class are Defendants, the officers and directors of Bumble at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns, and any entity in which Defendants have or had a controlling interest.

146.    The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, Bumble Class A common shares were actively traded on the NASDAQ. As of June 30, 2021, Bumble had 119,799,036 shares of common stock outstanding. While the exact number of Class members is unknown to Plaintiffs at this time and can only be ascertained through appropriate discovery, Plaintiffs believe that there are hundreds or thousands members of the proposed Class. Class members who purchased Bumble common shares may be identified from records maintained by Bumble or its transfer agent(s), and may be notified of this class action using a form of notice similar to that customarily used in securities class actions.

147.    Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

148.    Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.

149.    Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

      (a)    whether Defendants violated the Securities Act;

      (b)    whether the SPO Offering Documents were negligently prepared and contained false or misleading statements of material fact and omitted material information required to be stated therein; and

      (c)    to what extent the members of the Class have sustained damages and the proper measure of damages.

150.    A class action is superior to all other available methods for the fair and efficient adjudication of this action because joinder of all Class members is impracticable. Additionally, the damage suffered by some individual Class members may be relatively small so that the burden and expense of individual litigation makes it impossible for such members to individually redress the wrong done to them. There will be no difficulty in the management of this action as a class action.

## VIII.   CLAIMS FOR RELIEF UNDER THE SECURITIES ACT

### COUNT I
**For Violations of Section 11 of the Securities Act**
**(Against Bumble, the Executive Defendants,**
**the Director Defendants, and the Underwriter Defendants)**

151.    Plaintiffs repeat and reallege every allegation above as if fully alleged in this Count.

152.     This Count is based on Defendants' statutory liability for false and materially misleading statements or omissions in the SPO Offering Documents.  This Count does not sound

in fraud, and any allegations of knowing or reckless misrepresentations or omissions in the SPO Offering Documents are disclaimed and excluded from this Count, except that any challenged statements of opinion or belief are alleged to have been materially untrue statements of opinion or belief when made at the time of the SPO.

153.    This Count is asserted against Defendant Bumble, the Executive Defendants, the Director Defendants, and the Underwriter Defendants for violations of Section 11 of the Securities Act, 15 U.S.C. § 77k, on behalf of all persons who acquired shares of Bumble common stock pursuant to the SPO Offering Documents.

154.    As alleged above, the SPO Offering Documents contained untrue statements and omissions of material fact concerning, among other things, Bumble's growth, growth in paying users, and known trends, and presented risks to the Company as merely hypothetical, when in fact those risks had already materialized.

155.    As the issuer of the registered securities, Bumble is strictly liable for the untrue statements of material fact and material omissions alleged in this Count.

156.    None of the Defendants named in this Count made a reasonable investigation or possessed reasonable grounds for the belief that the statements contained in the SPO Offering Documents were accurate and complete in all material respects.  Had they exercised reasonable care, they would have known of the material misstatements and omissions alleged in this Count.

157.    Class members did not know, nor in the exercise of reasonable diligence could they have known, that the SPO Offering Documents contained untrue statements of material fact and omitted to state material facts required to be stated or necessary to make the statements identified above not misleading when they purchased or acquired the registered securities. As a direct and proximate result of the acts and omissions of the Defendants named in this Count in violation of

the Securities Act, the Class suffered substantial damage in connection with its purchase of Bumble common stock sold through the SPO.

158.    This claim is brought within one year of discovery of the untrue statements and omissions in the SPO Offering Documents and within three years of their effective dates.

159.    By reason of the foregoing, the Defendants named in this Count are liable under Section 11 of the Securities Act to members of the Class who purchased or otherwise acquired the securities sold in or traceable to the SPO Offering Documents.

### COUNT II
**For Violations of Section 12(a)(2) of the Securities Act
(Against Bumble and the Underwriter Defendants)**

160.    Plaintiffs repeat and reallege every allegation above as if fully alleged in this Count.

161.    This Count is based on Defendants' statutory liability for false and materially misleading statements or omissions in the SPO Offering Documents.  This Count does not sound in fraud, and any allegations of knowing or reckless misrepresentations or omissions in the SPO Offering Documents are disclaimed and excluded from this Count, except that any challenged statements of opinion or belief are alleged to have been materially untrue statements of opinion or belief when made at the time of the SPO.

162.    This Count is asserted by Louisiana Sheriffs against Bumble and the Underwriter Defendants (with respect to the SPO underwritten by them) for violations of Section 12(a)(2) of the Securities Act, 15 U.S.C. § 77*l*(a)(2), on behalf of all persons who acquired shares of Bumble common stock pursuant to the SPO Offering Documents.

163.    Bumble and the Underwriter Defendants were sellers, offerors, and/or solicitors of purchasers of the shares offered pursuant to the SPO Offering Documents, including the Registration Statement.

164.    As alleged above, the SPO Offering Documents contained untrue statements and omissions of material fact concerning, among other things, Bumble's growth, growth in paying users and known trends, and presented risks to the Company as merely hypothetical, when in fact those risks had already materialized.

165.    By means of the SPO Offering Documents (as well as instruments of transportation and communication in interstate commerce and the mails), the Defendants named in this Count, through the SPO, which were public offerings, solicited and sold Bumble common stock to members of the Class.

166.    As the issuer of the registered securities, Bumble is strictly liable for the untrue statements of material fact and material omissions alleged in this Count.

167.    None of the Underwriter Defendants made a reasonable investigation or possessed reasonable grounds for the belief that the statements contained in the SPO Offering Documents were accurate and complete in all material respects. Had they exercised reasonable care, these Defendants would have known of the material misstatements and omissions alleged herein.

168.    Class Members purchased Bumble stock pursuant to the materially untrue or misleading SPO Offering Documents. Class members did not know, nor in the exercise of reasonable diligence could they have known, that the SPO Offering Documents contained untrue statements of material fact and omitted to state material facts required to be stated or necessary to make the statements identified above not misleading when they purchased such securities.

169.    This claim is brought within one year of discovery of the untrue statements and omissions in the SPO Offering Documents and within three years of their effective dates.

170.    By reason of the foregoing, Bumble and the Underwriter Defendants are liable for violations of Section 12(a)(2) of the Securities Act to Class members who purchased securities

sold pursuant to the SPO Offering Documents. Such Class members also have the right to rescind and recover the consideration paid for such securities upon tender of their stock to the Underwriter Defendants, and to recover rescissory damages to the extent they have already sold such securities.

**COUNT III**
**For Violations of Section 15 of the Securities Act**
**(Against the Blackstone Defendants and the Executive Defendants)**

171.    Plaintiffs repeat and reallege every allegation above as if fully alleged in this Count.

172.    This Count is based on Defendants' statutory liability for false and materially misleading statements or omissions in the SPO Offering Documents.  This Count does not sound in fraud, and any allegations of knowing or reckless misrepresentations or omissions in the SPO Offering Documents are disclaimed and excluded from this Count, except that any challenged statements of opinion or belief are alleged to have been materially untrue statements of opinion or belief when made at the time of the SPO.

173.    This Count is asserted against the Blackstone Defendants and the Executive Defendants who, by virtue of their positions, voting power, ownership, rights as against Bumble, and/or specific acts, were, at the time of the wrongs alleged herein and as set forth herein, controlling persons of Bumble within the meaning of Section 15 of the Securities Act.  These Defendants also had the power and influence, and exercised the same, to cause Bumble to engage in the acts described herein, including by causing Bumble to conduct the Offerings pursuant to the SPO Offering Documents.

174.    Bumble is strictly liable under §§ 11 and 12(a)(2) of the Securities Act for untrue statements and omissions of material fact in the SPO Offering Documents.

175.    The Executive Defendants each were control persons of Bumble by virtue of their positions as directors and/or senior officers of the Company.  By reason of their positions of control and authority as officers or directors of Bumble, these Defendants had the power and authority to

49

direct the management and activities of the Company and its employees, and to cause the Company to engage in the wrongful conduct complained of herein.

176.    Further, Defendant Herd, throughout the Class Period, maintained a controlling interest in both Bumble's common stock and in its voting securities; caused Bumble to enter into the Stockholders Agreement, which, among other things, gave Defendant Herd the right, under certain conditions, to designate one Director to the Board;  and Defendant Herd served as a Director of Bumble.

177.    Blackstone controlled Bumble due to its beneficial stock ownership, the terms of the Stockholders Agreement, and Blackstone's control over certain Board members and observers. Blackstone also served as an underwriter of the SPO.  Indeed, (i) Bumble's SPO Offering Documents stated that, "Bumble Inc. is controlled by investment funds of Blackstone Inc."; (ii) Blackstone maintained a controlling interest in both Bumble's common stock and in its voting securities; (iii) Blackstone had the power to designate the Board's directors, which included Anderson, Bavishi, Bromberg, Korngold, and Morgan at the time of the SPO, all of whom are senior personnel at Blackstone; (iv) Blackstone "buil[t] a senior leadership team at Bumble"; and (v) Blackstone caused Bumble to enter into the Stockholders Agreement, which, among other things, gave Blackstone sweeping rights to access non-public information regarding the Company. Further, Blackstone exercised its control over Bumble to cause the Company to conduct the SPO and its representatives on the Bumble Board signed the registration statements pursuant to which the SPO was conducted.

178.    As alleged above, in its SPO Offering Documents, Bumble readily acknowledged that Blackstone and Herd controlled the Company.  For example, the SPO Offering Documents stated that Blackstone and Herd "control us" and, given this pervasive control, "their interests may

conflict with ours or yours in the future," and that Bumble "is controlled by investment funds of Blackstone Inc." In particular, Bumble acknowledged that Blackstone and Herd, as controlling shareholders, had "outsized voting rights" that "have the effect of concentrating control with [Blackstone and Herd]," and could "limit or preclude [shareholders'] ability to influence corporate matters."

179.    At the time of the SPO, Blackstone owned the plurality of Bumble's total outstanding securities. Prior to the SPO, Blackstone held 45.7% of Bumble's Class A Common Stock and 23.2% of Bumble's Common Units, and had 76.1% of the combined voting power over Bumble. Furthermore, at the time of the SPO, Blackstone and Herd were "able to ***control all matters submitted to our stockholders for approval, even if they own significantly less than 50% of the shares of our Class A common stock***, assuming full exchange of Common Units." The Company acknowledged that "[t]his concentrated control could discourage others from initiating a potential merger, takeover or other change of control transaction that other stockholders may view as beneficial."

180.    According to the SPO Offering Documents Blackstone and Herd held 95% of the voting power in Bumble immediately prior to the SPO, and were to hold 93% of the voting power immediately following the SPO. Blackstone and Herd also had the unique right to designate directors of the Company, which did not disappear when Blackstone or Herd "cease[d] to own shares . . . representing a majority of the total voting power." Rather, the FY20 10-K disclosed, "so long as our Principal Stockholders [Blackstone and Herd] continue to own a significant percentage of our stock, they will still be able to significantly influence or effectively control the composition of our board of directors and the approval of actions requiring stockholder approval through their voting power." This, the FY20 10-K disclosed, ensured that Blackstone and Herd

would "have significant influence with respect to our management, business plans and policies, including the appointment and removal of our officers."

181.    This arrangement gave particularly privileged status to Blackstone.  As the FY20 10-K described, "[F]or so long as our Sponsor continues to own a significant percentage of our stock, our Sponsor will be able to cause or prevent a change of control of our company or a change in the composition of our board of directors and could preclude any unsolicited acquisition of our company."

182.    By virtue of the conduct alleged herein, the Blackstone Defendants and the Executive Defendants are liable for the aforesaid wrongful conduct and are liable to members of the Class who purchased Bumble common stock in the SPO and pursuant and/or traceable to the SPO Offering Documents.

## IX.    PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for relief and judgment, as follows:

(a)    Determining that this action is a proper class action under Rule 23 of the Federal Rules of Civil Procedure;

(b)    Awarding all damages and other remedies set forth in the Securities Act in favor of Plaintiffs and the other Class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongful conduct, in an amount to be proven at trial, including interest thereon;

(c)    As to the Claims alleged under the Securities Act, awarding rescission or a rescissionary measure of damages as appropriate;

(d)    Awarding Plaintiffs and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

(e)    Such other and further relief as the Court may deem just and proper.

## X.     JURY DEMAND

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiffs hereby demand a trial by jury in this action and all issues so triable.

DATED:  October 7, 2022

**BERNSTEIN LITOWITZ BERGER**
 **& GROSSMANN LLP**

*/s/ Jeremy P. Robinson*
Salvatore Graziano
Jeremy P. Robinson
William E. Freeland
1251 Avenue of the Americas
New York, NY  10020
Tele: (212) 554-1400
Fax:  (212) 554-1444
salvatore@blbglaw.com
jeremy@blbglaw.com
billy.freeland@blbglaw.com

*Counsel for Lead Plaintiff and the Proposed Class*

**KLAUSNER, KAUFMAN, JENSEN
& LEVINSON, P.A.**

Robert D. Klausner
Stuart A. Kaufman
7080 Northwest 4th Street
Plantation, FL 33317
Telephone: (954) 916-1202
Facsimile: (954) 916-1232
bob@robertdklausner.com
stu@robertdklausner.com

*Additional Counsel for Plaintiff Louisiana Sheriffs' Pension & Relief Fund*