**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| IN RE BUMBLE, INC. SECURITIES LITIGATION | Civil Action No. 22-cv-624 (DLC) <br><br> CLASS ACTION |

**MEMORANDUM OF LAW IN SUPPORT OF LEAD PLAINTIFF'S**
**MOTION FOR FINAL APPROVAL OF SETTLEMENT**
**AND PLAN OF ALLOCATION**

BERNSTEIN LITOWITZ BERGER &
    GROSSMANN LLP
Salvatore Graziano
Jeremy P. Robinson
William E. Freeland
1251 Avenue of the Americas
New York, NY 10020

*Lead Counsel for Lead Plaintiff and the*
    *Settlement Class*

KLAUSNER, KAUFMAN, JENSEN &
    LEVINSON, P.A.
Robert D. Klausner
Stuart A. Kaufman
7080 Northwest 4th Street
Plantation, FL 33317

*Additional Counsel for Lead Plaintiff*

Dated:   June 28, 2023

# TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ..................................................................................................1

ARGUMENT ..........................................................................................................................5

I.  THE PROPOSED SETTLEMENT MERITS FINAL APPROVAL ..................................5

    A.  Lead Plaintiff and Lead Counsel Have Zealously And Adequately Represented the Settlement Class ..................................................................6

    B.  The Settlement Was Reached After Arm's-Length Negotiations Supervised By an Experienced Mediator, and Following Extensive Discovery .............................................................................................................7

    C.  The Proposed Settlement Is Fair, Reasonable, and Adequate In Light of the Costs and Risks of Further Litigation and Similar Factors ...........................10

        1.  The Risks of Establishing Liability and Damages Support Approval of the Settlement ........................................................................11

            (a)  Risks To Proving Liability............................................................11

            (b)  Risks Related to Defendants' Due-Diligence Defenses and Negative-Causation, and To Lead Plaintiff's Proof of Damages........................................................................................12

            (c)  Conclusion .................................................................................14

        2.  The Settlement Is Also Fair and Reasonable in Light of Realistically Recoverable Damages............................................................14

        3.  The Costs and Delays of Continued Litigation Support Approval of the Settlement........................................................................................15

        4.  All Other Rule 23(e)(2)(C) Factors Also Support Approval ....................15

    D.  The Settlement Treats Class Members Equitably Relative to Each Other ...........16

    E.  The Reaction of the Settlement Class to the Settlement ........................................17

II.  THE PLAN OF ALLOCATION IS FAIR AND REASONABLE, AND SHOULD BE APPROVED ...................................................................................................18

III.  THE SETTLEMENT CLASS SHOULD BE CERTIFIED...............................................19

IV.  THE NOTICE TO THE SETTLEMENT CLASS SATISFIED THE REQUIREMENTS OF RULE 23 AND DUE PROCESS ...............................................19

CONCLUSION....................................................................................................................21

## TABLE OF AUTHORITIES

**Page(s)**

CASES

*In re Advanced Battery Techs., Inc. Sec. Litig.*,
    298 F.R.D. 171 (S.D.N.Y. 2014) ...................................................................21

*Amgen Inc. v. Conn. Ret. Plans & Trust Funds*,
    568 U.S. 455 (2013)........................................................................................7

*In re Barrick Gold Sec. Litig.*,
    314 F.R.D. 91 (S.D.N.Y. 2016) .....................................................................6

*In re Bear Stearns Cos., Inc. Sec., Derivative, & ERISA Litig.*,
    909 F. Supp. 2d 259 (S.D.N.Y. 2012)...................................................17, 18

*In re Blue Apron Holdings, Inc. Sec. Litig.*,
    2021 WL 345790 (E.D.N.Y. Feb. 1, 2021).................................................21

*In re Citigroup Inc. Sec. Litig.*,
    2014 WL 2112136 (S.D.N.Y. May 20, 2014) ..............................................5

*City of Detroit v. Grinnell Corp.*,
    495 F.2d 448 (2d Cir. 1974)............................................................5, 6, 8, 10

*D'Amato v. Deutsche Bank*, 236 F.3d 78, 85 (2d Cir. 2001) ...............................8

*Eisen v. Carlisle & Jacquelin*,
    417 U.S. 156 (1974)......................................................................................19

*In re Facebook, Inc. IPO Sec. & Derivative Litig.*,
    2015 WL 6971424 (S.D.N.Y. Nov. 9, 2015)..........................................8, 13

*In re Facebook, Inc. IPO Sec. & Derivative Litig.*,
    674 F. App'x 37 (2d Cir. 2016) .....................................................................8

*In re FLAG Telecom Holdings, Ltd. Sec. Litig.*,
    2010 WL 4537550 (S.D.N.Y. Nov. 8, 2010)........................................8, 10, 17, 18

*In re Gilat Satellite Networks, Ltd.*,
    2007 WL 1191048 (E.D.N.Y. Apr. 19, 2007) ............................................15

*Goldberger v. Integrated Res., Inc.*,
    209 F.3d 43 (2d Cir. 2000)............................................................................6

*In re IMAX Sec. Litig.*,
    283 F.R.D. 178 (S.D.N.Y. 2012) .................................................................18

*In re Luxottica Grp. S.p.A. Sec. Litig.*,
    233 F.R.D. 306 (E.D.N.Y. 2006) .................................................................................10, 12

*In re NASDAQ Market-Makers Antitrust Litig.*,
    187 F.R.D. 465 (S.D.N.Y. 1998) ........................................................................................10

*In re Payment Card Interchange Fee & Merch. Disc. Antitrust Litig.*,
    330 F.R.D. 11 (E.D.N.Y. 2019), *aff'd sub nom.*, 62 F.4th 704 (2d Cir. 2023) .......................6

*In re Qudian Inc. Sec. Litig.*,
    2021 WL 2383550 (S.D.N.Y. June 8, 2021) ........................................................................21

*Robbins v. Koger Props., Inc.*,
    116 F.3d 1441 (11th Cir. 1997) ..........................................................................................14

*Shapiro v. JPMorgan Chase & Co.*,
    2014 WL 1224666 (S.D.N.Y. Mar. 24, 2014) ......................................................................10

*In re Signet Jewelers Ltd. Sec. Litig.*,
    2020 WL 4196468 (S.D.N.Y. July 21, 2020) .......................................................................18

*In re Sturm, Ruger, & Co. Sec. Litig.*,
    2012 WL 3589610 (D. Conn. Aug. 20, 2012) ......................................................................15

*In re Veeco Instruments Inc. Sec. Litig.*,
    2007 WL 4115809 (S.D.N.Y. Nov. 7, 2007) .............................................................10, 13, 17

*Wal-Mart Stores, Inc. v. Visa U.S.A. Inc.*,
    396 F.3d 96 (2d Cir. 2005), *cert denied*, 544 U.S. 1044 (2005) ...................................5, 6, 20

*Weinberger v. Kendrick*,
    698 F.2d 61 (2d Cir. 1982), *cert. denied*, 464 U.S. 818 (1983) .............................................8

*Yang v. Focus Media Holding Ltd.*,
    2014 WL 4401280 (S.D.N.Y. Sept. 4, 2014) ..........................................................................8

**STATUTES**

Private Securities Litigation Reform Act of 1995 ................................................................4, 9, 20

Securities Act of 1933 ...............................................................................................13, 18, 19

**OTHER AUTHORITIES**

Federal Rules of Civil Procedure Rule 23(e) ....................................................................... *passim*

In accordance with Fed. R. Civ. P. 23(e), Lead Plaintiff Louisiana Sheriffs' Pension & Relief Fund ("Louisiana Sheriffs" or "Lead Plaintiff"), on behalf of itself and the Settlement Class, respectfully submits this memorandum of law in support of its motion for final approval of: (i) the proposed $18,000,000 settlement of this securities class action (the "Action") for the benefit of the Settlement Class (the "Settlement"), and (ii) the proposed plan of allocation of the proceeds of the Settlement (the "Plan of Allocation").[1]

## PRELIMINARY STATEMENT

Lead Plaintiff is pleased to present for the Court's approval its agreement to settle this securities class action in full in exchange for a cash payment of $18,000,000 for the benefit of the Settlement Class. Lead Plaintiff respectfully submits that the proposed Settlement is a favorable result for the Settlement Class that readily satisfies all the standards for final approval under Rule 23(e) of the Federal Rules of Civil Procedure and Second Circuit precedent.

The $18 million Settlement is a favorable result for the Settlement Class given the substantial risks of continued litigation. This was not a case where Lead Plaintiff could point to restated financial statements or a parallel government enforcement action to bolster its claims. Instead, as discussed below and in the Robinson Declaration,[2] Lead Plaintiff faced many significant risks to establishing both liability and damages in trying to prove its case.

---

[1] Unless otherwise noted, capitalized terms have the meanings given them in the Stipulation and Agreement of Settlement dated March 27, 2023 (ECF No. 68-1) (the "Stipulation") or in the Declaration of Jeremy P. Robinson in Support of (A) Lead Plaintiff's Motion for Final Approval of Class Action Settlement and Plan of Allocation and (B) Lead Counsel's Motion for Attorneys' Fees and Litigation Expenses (the "Robinson Declaration" or "Robinson Decl."), filed herewith. Citations herein to "¶ __" and "Ex.__" refer, respectively, to paragraphs in, and exhibits to the Robinson Declaration.

[2] The Robinson Declaration is an integral part of this submission and, for the sake of brevity in this memorandum, the Court is respectfully referred to it for a detailed description of, among other things: the history of the Action (¶¶ 14-30); the nature of the claims asserted (¶¶ 24-25); the negotiations leading to the Settlement and terms of the Settlement (¶¶ 31-40); the risks and

By way of brief summary, Lead Plaintiff alleged that the Offering Documents filed in connection with Bumble's Secondary Public Offering (the "SPO") contained materially false and misleading statements concerning Bumble's business and financial performance and, in particular, about growth in paying users across the Company's two primary dating apps, the Bumble App and the Badoo App. Throughout the litigation, Defendants insisted that they did not make a single actionable misrepresentation in the SPO. For example, Defendants argued that the Company's affirmative statements about its "growth" were made in the context of the overall Bumble user community as a whole and not in the limited context of paying users in particular. In addition, Defendants argued, among other things, that: (i) the challenged risk statements in the SPO Offering Documents were either not misleading because the risks warned of had not materialized or because those risks that had materialized had been previously disclosed to the market; (ii) the presentation of Bumble's historical data about paying users on the Bumble App and Badoo App was not misleading because accurate historical data cannot support a securities claim; (iii) certain of the representations were opinion statements that are also not actionable under the securities laws; and (iv) Bumble had no obligation to disclose an immaterial, intra-quarter decline in paying user numbers, especially in the context of a quarter-end where Bumble's overall financial results were positive. Defendants other than Bumble also would have argued that, even if there were actionable misstatements in the SPO (which they denied), they conducted reasonable due diligence and therefore could not be held liable for such misstatements.

In addition to those liability risks, Lead Plaintiff faced significant risks in establishing class-wide damages. Had this case continued, Defendants would have pursued a "negative

---

uncertainties of continued litigation (¶¶ 41-51); and the terms of the Plan of Allocation for the Settlement proceeds (¶¶ 62-68).

causation" defense by arguing that relevant declines in the price of Bumble Class A common stock were caused by factors other than the revelation of the truth concerning the alleged misstatements. If Defendants were successful in establishing this defense, even if Lead Plaintiff prevailed on liability, the class-wide recoverable damages might have been significantly reduced or even zero.

The Settlement is the product of extensive, arm's-length settlement negotiations between experienced counsel supervised by an experienced mediator. In its August 25, 2022 lead plaintiff order, the Court required the Parties to "engage in mediation no later than November 2022." ECF No. 36. The Parties retained Jed D. Melnick, Esq., a well-known neutral mediator with extensive experience mediating securities cases (the "Mediator"). In connection with the Court-ordered mediation process, Lead Plaintiff and Bumble exchanged detailed mediation submissions, and held an in-person mediation session before the Mediator on November 3, 2022. Although the parties were unable to reach an agreement at the mediation, periodically throughout the briefing of Defendants' Motion to Dismiss, Lead Plaintiff and Bumble continued to discuss the possible resolution of the Action with the assistance and oversight of the Mediator. After months of extensive arm's length negotiations supervised by the Mediator, on February 6, 2023, the Parties reached a non-binding agreement to settle the Action for $18 million in cash. The non-binding agreement to settle was conditioned on Lead Plaintiff confirming the fairness, reasonableness, and adequacy of the proposed Settlement based on negotiated confidential discovery provided by Bumble. In connection with discovery, Bumble produced a total of 42,625 pages of documents concerning the facts alleged in the Complaint, which Lead Counsel reviewed and analyzed. The confidential discovery further confirmed Lead Plaintiff's and Lead Counsel's determination that the Settlement is fair, reasonable, and adequate to the Settlement Class. The Parties signed the binding Stipulation and Agreement of Settlement on March 27, 2023.

Absent the Settlement, Plaintiff and the Settlement Class faced the prospect of protracted litigation through the motion to dismiss, which could have resulted in the complete dismissal of the Action; the completion of fact discovery; costly expert discovery; summary judgment; a complex trial; post-trial motions on both liability and damages; and the inevitable appeals. The Settlement avoids these risks and delays while providing a meaningful, certain, and immediate $18 million benefit to the Settlement Class.

The Settlement also has the full support of the Court-appointed Lead Plaintiff, which is a sophisticated institutional investor of the type Congress favored when it passed the Private Securities Litigation Reform Act of 1995 ("PSLRA"). Louisiana Sheriffs was actively involved in the litigation and the settlement negotiations, and it endorses approval of the Settlement. *See* Declaration of Osey "Skip" McGee, Jr. (Ex. 1), at ¶¶ 5-6. Further, although the July 12, 2023 deadline for Settlement Class Members to object or to request exclusion from the Settlement Class has not yet passed, to date no one has objected to the Settlement or even requested exclusion.[3] Accordingly, and as further discussed below, Lead Plaintiff respectfully submits that the Settlement is fair, reasonable, and adequate, and merits final approval by the Court.

The Court should also approve the Plan of Allocation, which Lead Counsel developed in consultation with Lead Plaintiff's expert consultant on damages, as it provides a reasonable method for allocating the net Settlement proceeds among eligible Settlement Class Members on a *pro rata* basis.

---

[3] Should any objections or requests for exclusion be received, Lead Plaintiff will address them in its reply papers, due on July 26, 2023.

**ARGUMENT**

**I.  THE PROPOSED SETTLEMENT MERITS FINAL APPROVAL**

Federal Rule of Civil Procedure 23(e) requires judicial approval for any compromise or settlement of class-action claims. *See* Fed. R. Civ. P. 23(e). A class-action settlement merits approval where the court finds it "fair, reasonable, and adequate." Fed. R. Civ. P. 23(e)(2).

The Second Circuit has recognized that public policy favors the settlement of disputed claims among private litigants, particularly in class actions. *See Wal-Mart Stores, Inc. v. Visa U.S.A. Inc.*, 396 F.3d 96, 116 (2d Cir. 2005) ("*Visa*") ("We are mindful of the 'strong judicial policy in favor of settlements, particularly in the class action context.'") (citation omitted), *cert denied*, 544 U.S. 1044 (2005). In ruling on final approval of a class settlement, a court should examine both the negotiating process leading to the settlement, and the settlement's substantive terms. *See Visa*, 396 F.3d at 116; *In re Citigroup Inc. Sec. Litig.*, 2014 WL 2112136, at *2-3 (S.D.N.Y. May 20, 2014).

Rule 23(e)(2) provides that courts should determine whether a proposed settlement is "fair, reasonable, and adequate" after considering whether:

> (A) the class representatives and class counsel have adequately represented the class; (B) the proposal was negotiated at arm's length; (C) the relief provided for the class is adequate, taking into account: (i) the costs, risks, and delay of trial and appeal; (ii) the effectiveness of any proposed method of distributing relief to the class, including the method of processing class-member claims; (iii) the terms of any proposed award of attorney's fees, including timing of payment; and (iv) any agreement required to be identified under Rule 23(e)(3); and (D) the proposal treats class members equitably relative to each other.

Fed. R. Civ. P. 23(e)(2). Similarly, the Second Circuit has historically held that courts should consider following factors from *City of Detroit v. Grinnell Corp*. in evaluating class settlements:

> (1) the complexity, expense and likely duration of the litigation; (2) the reaction of the class to the settlement; (3) the stage of the proceedings and the amount of

discovery completed; (4) the risks of establishing liability; (5) the risks of establishing damages; (6) the risks of maintaining the class action through the trial; (7) the ability of the defendants to withstand a greater judgment; (8) the range of reasonableness of the settlement fund in light of the best possible recovery; [and] (9) the range of reasonableness of the settlement fund to a possible recovery in light of all the attendant risks of litigation.

495 F.2d 448, 463 (2d Cir. 1974) (citations omitted), *abrogated on other grounds by Goldberger v. Integrated Res., Inc.*, 209 F.3d 43 (2d Cir. 2000), *see also Visa*, 396 F.3d at 117.

The Advisory Committee Notes to the 2018 amendments to the Federal Rules note that the four factors set forth in Rule 23(e)(2) are not intended to "displace" any factor previously adopted by a Court of Appeals, but "rather [seek] to focus the court and the lawyers on the core concerns of procedure and substance that should guide the decision whether to approve the proposal." Advisory Committee Notes to 2018 Amendments. For the sake of completeness and efficiency, Lead Plaintiff addresses below the Settlement's "fairness, reasonableness, and adequacy" principally under the four factors listed in Rule 23(e)(2), while also discussing application of relevant, non-duplicative *Grinnell* factors. *See In re Payment Card Interchange Fee & Merch. Disc. Antitrust Litig.*, 330 F.R.D. 11, 29 (E.D.N.Y. 2019), *aff'd sub nom.*, 62 F.4th 704 (2d Cir. 2023) (noting that "the new Rule 23(e) factors to add to, rather than displace, the *Grinnell* factors"). As set forth below, ***all*** of the relevant factors strongly support approval here.

### A.    Lead Plaintiff and Lead Counsel Have Zealously And Adequately Represented the Settlement Class

In weighing approval, a court should consider whether "the class representatives and class counsel have adequately represented the class." Fed. R. Civ. P. 23(e)(2)(A); *see also In re Barrick Gold Sec. Litig.*, 314 F.R.D. 91, 99 (S.D.N.Y. 2016) ("the adequacy requirement 'entails inquiry as to whether: (1) plaintiffs' interests are antagonistic to the interest of other members of the class and (2) plaintiffs' attorneys are qualified, experienced and able to conduct the litigation'").

Here, there is no antagonism or conflict between Lead Plaintiff and the proposed class. Lead Plaintiff, like the other Settlement Class Members, purchased Bumble Class A common stock directly in or traceable to the SPO and were injured by the same alleged misstatements. If Lead Plaintiff were to prove its claims at trial, it would also prove the Settlement Class's claims. *See Amgen Inc. v. Conn. Ret. Plans & Trust Funds*, 568 U.S. 455, 460 (2013) (the investor class "will prevail or fail in unison" because claims are based on common misrepresentations and omissions).

Moreover, it is respectfully submitted that Lead Plaintiff and Lead Counsel have vigorously represented the Settlement Class both by prosecuting the Action since its inception and by negotiating a favorable $18 million Settlement. *See supra* at 1-2 (summarizing Lead Counsel's efforts); *see also* Robinson Decl. (*passim*). Lead Counsel also note that they are well qualified and highly experienced in securities litigation (*see* Lead Counsel's firm resume at Ex. 3A-3), and achieved a successful result here against highly regarded opposing counsel. ¶ 85. Accordingly, Lead Plaintiff and Lead Counsel have adequately represented the Settlement Class.

### B. The Settlement Was Reached After Arm's-Length Negotiations Supervised By an Experienced Mediator, and Following Extensive Discovery

Courts must also consider whether a proposed settlement "was negotiated at arm's length." Fed. R. Civ. P. 23(e)(2)(B), and traditionally courts consider certain other related factors in assessing the "procedural" fairness of a settlement. These factors include: (i) whether counsel had an adequate understanding of the case's strengths and weakness based on "the stage of the

proceedings and the amount of discovery completed,"[4] (ii) any indicia of collusion;[5] and (iii) the involvement of an independent mediator. Here, these factors also strongly support approval of the Settlement.

First, the Settlement was reached only after extensive, arm's-length negotiations and a Court-ordered mediation process conducted under the auspices of Jed D. Melnick, an experienced mediator of securities class actions. ¶¶ 3, 31-32. The mediation process involved the exchange of detailed written submissions, an in-person mediation session before Mr. Melnick on November 3, 2022, and months of extensive negotiations supervised by Mr. Melnick that ultimately resulted in the Parties' agreement to settle this litigation. *Id.* at ¶¶ 3, 33-36. The settlement negotiations were conducted on an arms'-length basis throughout. These facts powerfully support a finding that the Settlement is procedurally fair and free of collusion. *See, e.g., D'Amato v.* Deutsche *Bank*, 236 F.3d 78, 85 (2d Cir. 2001) (mediator's involvement in settlement negotiations "helps to ensure that the proceedings were free of collusion and undue pressure"); *Yang v. Focus Media Holding Ltd.*, 2014 WL 4401280, at \*5 (S.D.N.Y. Sept. 4, 2014) (participation of highly qualified mediator "strongly supports a finding that negotiations were conducted at arm's length and without collusion."); *In re FLAG Telecom Holdings, Ltd. Sec. Litig.*, 2010 WL 4537550, at \*14 (S.D.N.Y. Nov. 8, 2010) (finding that proposed settlement was fair and reasonable "is strengthened by the fact that [it] was reached in an extended mediation").

---

[4] *See Grinnell*, 495 F.2d at 463 (third factor); *see also In re Facebook, Inc. IPO Sec. & Derivative Litig.*, 2015 WL 6971424, at \*4 (S.D.N.Y. Nov. 9, 2015) ("the question is whether the parties had adequate information about their claims such that their counsel can intelligently evaluate the merits of plaintiff's claims, the strengths of the defenses asserted by defendants, and the value of plaintiffs' causes of action for purposes of settlement"), *aff'd*, 674 F. App'x 37 (2d Cir. 2016).

[5] *Weinberger v. Kendrick*, 698 F.2d 61, 74 (2d Cir. 1982) ("the absence of any indication of collusion, the protracted settlement negotiations, the ability and experience of plaintiffs' counsel, [and] the extensive discovery preceding settlement . . . are important indicia of the propriety of settlement negotiations"), *cert. denied*, 464 U.S. 818 (1983).

Moreover, as noted above, the Parties and their counsel were well informed about the strengths and weaknesses of the case before they agreed to settle. Among other things, Lead Counsel had (i) conducted an extensive investigation before filing the Complaint, including interviewing multiple former Bumble employees and thoroughly reviewing the Offering Documents, other SEC filings, investor conference calls, press releases, media reports, and other public information; (ii) researched and briefed Defendants' Motion to Dismiss; (iii) consulted with Lead Plaintiff's damages consulting expert; (iv) prepared detailed mediation submissions on issues of liability and damages—and reviewed Bumble's mediation submissions; (v) engaged in extensive arm's length negotiations with Defendants' Counsel supervised by the Mediator; and (vi) as described further below, reviewed and analyzed confidential discovery produced by Bumble in connection with the mediation process. Thus, Lead Plaintiff and Lead Counsel were well informed as to the strengths and weaknesses of the claims and defenses when they negotiated the Settlement.

In particular, the confidential discovery undertaken by Lead Counsel before entering into the Stipulation allowed Lead Plaintiff and Lead Counsel to confirm that the $18 million Settlement is fair, reasonable, and adequate given the risks of the case. Lead Counsel's review and analysis of the over 42,000 pages of confidential documents produced by Bumble provided a more thorough understanding of the facts and risks of the case and Defendants' arguments, and further supports that the Settlement is fair and reasonable.

Lead Plaintiff itself strongly supports the Settlement, which is another factor that weighs in favor of approval. Indeed, Lead Plaintiff is a sophisticated institutional investor of the exact type envisioned by the PSLRA to lead securities class actions like this one. *See* Ex. 1, at ¶ 3. A settlement reached "under the supervision and with the endorsement of a sophisticated institutional

investor is . . . 'entitled to an even greater presumption of reasonableness.'" *In re Veeco Instruments Inc. Sec. Litig.*, 2007 WL 4115809, at *5 (S.D.N.Y. Nov. 7, 2007).

Finally, the judgment of Lead Counsel, which is highly experienced in securities class-action litigation, is entitled to "great weight." *Shapiro v. JPMorgan Chase & Co.*, 2014 WL 1224666, at *2 (S.D.N.Y. Mar. 24, 2014); *accord In re NASDAQ Market-Makers Antitrust Litig.*, 187 F.R.D. 465, 474 (S.D.N.Y. 1998) (courts consistently give "'great weight' . . . to the recommendations of counsel, who are most closely acquainted with the facts of the underlying litigation"). Lead Counsel strongly endorses the Settlement.

### C.    The Proposed Settlement Is Fair, Reasonable, and Adequate In Light of the Costs and Risks of Further Litigation and Similar Factors

In determining whether a class action settlement is "fair, reasonable, and adequate," the Court must also consider whether "the relief provided for the class is adequate, taking into account . . . the costs, risks, and delay of trial and appeal" and similarly relevant factors. Fed. R. Civ. P. 23(e)(2)(C); *see Grinnell*, 495 F.2d at 455 ("most important factor" is "strength of the case for plaintiffs on the merits, balanced against the amount offered in settlement.").[6]

As a threshold matter, courts "have long recognized that [securities class action] litigation is notably difficult and notoriously uncertain." *FLAG Telecom*, 2010 WL 4537550, at *15. Accordingly, such suits "readily lend themselves to compromise because of the difficulties of proof, the uncertainties of the outcome, and the typical length of the litigation." *In re Luxottica Grp. S.p.A. Sec. Litig.*, 233 F.R.D. 306, 310 (E.D.N.Y. 2006). This case was no exception.

---

[6] This factor under Rule 23(e)(2)(C) essentially encompasses at least six of the nine factors of the traditional *Grinnell* analysis. *See Grinnell*, 495 F.2d at 463 ("(1) the complexity, expense and likely duration of the litigation; . . . (4) the risks of establishing liability; (5) the risks of establishing damages; (6) the risks of maintaining the class action through the trial; . . . (8) the range of reasonableness of the settlement fund in light of the best possible recovery; [and] (9) the range of reasonableness of the settlement fund to a possible recovery in light of all the attendant risks of litigation") (citations omitted).

As detailed in the Robinson Declaration and below, continuing the litigation here through the resolution of the Motion to Dismiss, the completion of fact and expert discovery, trial, and inevitable appeals would have presented numerous significant risks—and necessarily involved substantial costs and delays—all without any assurance of obtaining a better (or indeed any) recovery. Indeed, as discussed below, the proposed $18 million Settlement represents 4.9% of the theoretical maximum damages and 10% of the reasonably likely maximum damages, and thus represents a highly favorable "bird in the hand" given the litigation risks here. ¶ 50.

### 1. The Risks of Establishing Liability and Damages Support Approval of the Settlement

While Lead Plaintiff believes that its claims are meritorious, it recognizes that this Action presented several substantial risks to establishing both liability and damages.

### (a) Risks To Proving Liability

In considering whether to enter the Settlement, Lead Plaintiff and Lead Counsel weighed the $18 million Settlement Amount against the strength of Lead Plaintiff's claims, taking into consideration the risks inherent in proving liability and recoverable damages, as well as the expense and likely duration of the Action. As noted above, at the time that the Parties agreed to settle the Action, the Court had not yet decided Defendants' Motion to Dismiss the Complaint. Although Lead Plaintiff and Lead Counsel believe that they had compelling arguments in response to the Motion to Dismiss, there was a significant risk that the Court might have ruled in Defendants' favor, which would have dramatically reduced, or eliminated altogether, the potential recovery for the Settlement Class.

In that regard, Lead Plaintiff faced risk in establishing that there were materially false and misleading statements in the SPO Offering Documents. Indeed, Defendants vehemently denied making any actionable false statements in the SPO. For example, Defendants argued in their

motion to dismiss that the Company's affirmative statements about its "growth" were not misleading, including because they concerned the overall Bumble user community and not paying users specifically. Thus, Defendants insisted that Lead Plaintiff failed to allege, and could not prove, that Defendants' statements were false, much less materially so. ¶¶ 7, 26, 42. Defendants also argued that certain challenged representations were opinion statements that were not actionable because Lead Plaintiff did not adequately allege that these opinions were not actually held or that they were accompanied by untrue facts. ¶¶ 7, 26, 43. Defendants further argued that the challenged risk statements were either not misleading because the risks warned of had not materialized or because those risks that had materialized had been previously disclosed such that the market knew the truth and could not have been misled. ¶¶ 7, 26, 44. Defendants further argued that the SPO Offering Documents' presentation of Bumble's historical data about paying users on the Bumble App and Badoo App was not misleading because accurate historical data cannot support a securities claim as a matter of law. ¶¶ 8, 26, 44. In addition, Defendants argued that the information that Lead Plaintiff alleged should have been disclosed—the intra-quarter decline in total paying users and related metrics—was not material and did not have to be disclosed. ¶¶ 8, 26, 45. They also argued that Bumble's actual quarter-end financial results for the quarter in which the SPO occurred were overall positive. *Id*. In sum, Lead Plaintiff faced significant risk in establishing that Defendants made false and misleading statements.

#### (b) Risks Related to Defendants' Due-Diligence Defenses and Negative-Causation, and To Lead Plaintiff's Proof of Damages

In addition to the liability risks described above, Lead Plaintiff faced significant risks in prevailing on causation and class-wide damages. Indeed, even if Lead Plaintiff proved that statements in the Offering Documents were materially false or misleading, all Defendants (except Bumble) could still have avoided liability by demonstrating that they exercised "reasonable care"

in conducting their due diligence of the Offering Documents' accuracy and completeness. ¶¶ 9, 47. Such Defendants would have argued that their actions satisfied the applicable standard of care, and that they were thus they immune from Securities Act liability.

Equally serious, all Defendants (including Bumble) would have pursued a "negative causation" defense. ¶¶ 9, 47. In that regard, Defendants would have argued that the declines in the price of Bumble Class A common stock that Lead Plaintiff had identified were caused **not** by the revelation of any alleged misrepresentation, but rather by other negative news that was not causally connected to the alleged misconduct. ¶ *Id.* If successful, Defendants' arguments would have substantially reduced—or even eliminated altogether—Lead Plaintiff's and the Settlement Class's recoverable damages.

In addition, Defendants would have also continued to argue that, even if liability was found and their defenses rejected, Lead Plaintiff's expert had overestimated recoverable damages, and that such damages were a fraction of that amount. ¶ 51.

These disputed issues regarding negative causation and damages would have presented a prototypical battle of the experts at trial. There is no way to predict with any degree of certainty which expert's opinions the jury would have accepted. Had the jury accepted some or all of Defendants' expert's views, damages would been materially reduced, and potentially eliminated altogether. The Settlement eliminates those risks and provides a certain recovery for the Settlement Class. *See Facebook*, 2015 WL 6971424, at *5 ("[D]amages would be subject to a battle of the experts, with the possibility that a jury could be swayed by experts for Defendants, who could minimize or eliminate the amount Plaintiffs' losses. Under such circumstances, a settlement is generally favored over continued litigation."); *Veeco*, 2007 WL 4115809, at *9 ("a very lengthy

and complex battle of the parties' experts likely would have ensued at trial, with unpredictable results. These risks as to liability strongly militate in favor of the Settlement.").

**(c)      Conclusion**

In sum, Lead Plaintiff faced substantial risks to proving the issues of liability, negative causation, and damages. And, of course, even if Lead Plaintiff prevailed on the pending Motion to Dismiss, at then at summary judgment and trial, Defendants would likely have filed post-trial motions and appeals, thereby likely leading to additional years of litigation. *See, e.g., Robbins v. Koger Props., Inc.*, 116 F.3d 1441, 1448-49 (11th Cir. 1997) (jury verdict of $81 million for plaintiffs against accounting firm reversed on appeal on causation grounds, and judgment entered for defendant). The presence of such risks further weighs strongly in favor of approving the Settlement.

**2.      The Settlement Is Also Fair and Reasonable in
<u>Light of Realistically Recoverable Damages</u>**

Lead Plaintiff submits that the $18 million Settlement is also a favorable result when considered in relation to the maximum damages that could realistically be established at trial and the risks of the litigation. Assuming that Lead Plaintiff prevailed on liability issues at trial (which was far from certain), Lead Plaintiff's consulting damages expert has estimated that the absolute ***maximum*** theoretically possible damages amount available for the Settlement Class's Section 11 claims is approximately $369 million. ¶ 50. Importantly, this maximum theoretical figure assumes Lead Plaintiff's ***complete success*** in establishing Defendants' liability and damages, and in particular assumes that Defendants' negative causation arguments would be completely rejected. Accounting for Defendants' likely negative causation arguments, Lead Plaintiff's consulting damages expert calculated that the reasonably likely maximum damages would be approximately $180 million. *Id.* The $18 million Settlement therefore represents 4.9% of the maximum theoretical

14

damages and 10% of the maximum reasonably likely damages—either of which represents a superior result in the face of significant litigation risk. *See e.g., In re Sturm, Ruger, & Co. Sec. Litig.,* 2012 WL 3589610, at *7 (D. Conn. Aug. 20, 2012) (approving settlement representing approximately 3.5% of estimated damages).

### 3.    The Costs and Delays of Continued Litigation Support Approval of the Settlement

Further, the time and costs involved in continuing to litigate this case through the Motion to Dismiss, the completion of fact discovery, including depositions, expert discovery, and summary judgment—let alone through a trial and the inevitable post-trial motions and appeals—would have been *very* substantial. Indeed, it is widely recognized that "[s]ecurities class actions are generally complex and expensive to prosecute." *In re Gilat Satellite Networks, Ltd.*, 2007 WL 1191048, at *10 (E.D.N.Y. Apr. 19, 2007). Accordingly, this factor also weighs heavily in favor of approving the Settlement.

### 4.    All Other Rule 23(e)(2)(C) Factors Also Support Approval

Rule 23(e)(2)(C) also instructs courts to consider whether the relief provided for the class is adequate in light of "the effectiveness of any proposed method of distributing relief to the class, including the method of processing class-member claims;" "the terms of any proposed award of attorney's fees, including timing of payment;" and "any agreement required to be identified under Rule 23(e)(3)." Fed. R. Civ. P. 23(e)(2)(C)(ii)-(iv). These factors either further support approving the Settlement or are neutral, and certainly provide no basis for finding the Settlement inadequate.

First, the procedures for processing Settlement Class Members' claims and distributing the Settlement's proceeds to eligible claimants in cases of this type are well-established. In sum, the net Settlement proceeds will be distributed to eligible class members who submit required Claim Forms and supporting documentation to the Court-appointed Claims Administrator, JND Legal

15

Administration ("JND")—a highly experienced claims administration firm. JND will (a) review and process submitted claims under the supervision of Lead Counsel, (b) provide claimants with an opportunity to cure any deficiencies and bring any unresolved claims disputes to the Court, and (c) ultimately send claimants their *pro rata* share of the Net Settlement Fund (following entry of a final "Distribution Order" by the Court).[7] This type of claims processing is standard in securities class actions (as neither Lead Plaintiff nor Bumble possess individual investors' trading data that would otherwise allow the Parties to create a "claims-free" process to distribute Settlement funds).

Second, the relief provided the Settlement Class under the Settlement is also adequate when the terms of the proposed attorney's fee award is considered. As discussed in the accompanying Fee Memorandum, the proposed attorneys' fees of 25% of the Settlement Fund, to be paid upon approval by the Court, is fair and reasonable in light of Lead Counsel's work and the results achieved in the face of substantial litigation risk. Moreover, nothing in the Settlement is contingent on the approval of attorneys' fees, which are subject to separate approval by the Court. *See* Stipulation ¶ 16.

Lastly, courts should consider the fairness of a proposed settlement in light of any other agreements required to be identified under Rule 23(e)(3). *See* Fed. R. Civ. P. 23(e)(2)(C)(iv). Here, there are no such other agreements, as the only agreement is the Stipulation itself.

### D.    The Settlement Treats Class Members Equitably Relative to Each Other

The Settlement also treats Settlement Class Members equitably relative to one another. As noted at § II below, under the Plan of Allocation all eligible claimants will receive their *pro rata* share of the recovery based on the amount and timing of their transactions in Bumble Class A

---

[7] The Settlement is not a claims-made settlement. If the Settlement is approved, Defendants will have no right to the return of any portion of Settlement based on the number or amount of claims submitted. *See* Stipulation ¶ 13.

common stock. And Lead Plaintiff will receive precisely the same kind of *pro rata* recovery, calculated under the same Plan of Allocation provisions, as other Settlement Class Members.

> ### E.    <u>The Reaction of the Settlement Class to the Settlement</u>

One important factor set forth in *Grinnell,* but not included in Rule 23(e)(2), is the reaction of the class to the Settlement. *See, e.g.*, *In re Bear Stearns Cos., Inc. Sec., Derivative, & ERISA Litig.*, 909 F. Supp. 2d 259, 266 (S.D.N.Y. 2012); *FLAG Telecom*, 2010 WL 4537550, at *16; *Veeco*, 2007 WL 4115809, at *7.

Pursuant to the Preliminary Approval Order, JND began mailing copies of the Notice Packet (consisting of the Notice and Claim Form) to potential Settlement Class Members and their nominees on May 12, 2023. See Declaration of Luiggy Segura (Ex. 2), at ¶¶ 3-6. As of June 28, 2023, JND had sent a total of 85,389 copies of the Notice Packet to potential Settlement Class Members and nominees. *See id*. ¶ 9. In addition, the Summary Notice was published in *Investor's Business Daily* and transmitted over the *PR Newswire* on May 22, 2023. *See id*. ¶ 10. The Notice set out the essential terms of the Settlement and informed potential Settlement Class Members of, among other things, their right to object to any aspect of the Settlement or to opt out of the Settlement Class, as well as the procedure for submitting Claim Forms.

While the July 12, 2023 deadline set by the Court for Settlement Class Members to object or exclude themselves from the Settlement Class has not yet passed, to date no objection or requests for exclusion have been received. ¶ 62; Ex. 2, ¶ 13. As provided in the Preliminary Approval Order, Lead Plaintiff will address any objections or "opt-out" requests that may be received in reply papers (which are due on July 26, 2023). To date, however, the Settlement Class's reaction—like the other applicable Rule 23(e)(2) factors—strongly supports a finding that the Settlement is fair, reasonable, and adequate.

II.    **THE PLAN OF ALLOCATION IS FAIR AND REASONABLE, AND SHOULD BE APPROVED**

A plan for allocating settlement proceeds, like the settlement itself, should be approved if it is fair, reasonable, and adequate. *See In re IMAX Sec. Litig.*, 283 F.R.D. 178, 192 (S.D.N.Y. 2012); *Bear Stearns*, 909 F. Supp. 2d at 270. A plan of allocation is fair and reasonable as long as it has a "rational basis." *In re Signet Jewelers Ltd. Sec. Litig.*, 2020 WL 4196468, at *13 (S.D.N.Y. July 21, 2020); *FLAG Telecom*, 2010 WL 4537550, at *21. Generally, a plan of allocation that reimburses class members based on the relative strength and value of their claims is reasonable. *See Signet*, 2020 WL 4196468, at *13. In determining whether a plan of allocation is reasonable, "courts give great weight to the opinion of experienced counsel." *Id.*

Here, the proposed Plan of Allocation (or "Plan") was developed by Lead Counsel in consultation with Lead Plaintiff's expert consultant on damages, and is set forth in full in the Notice mailed to potential Settlement Class Members. *See* Ex. 2, Ex. A, at Appendix A. Lead Counsel respectfully submits that the Plan provides a fair and reasonable method to allocate the Net Settlement Fund among Settlement Class Members who submit valid Claim Forms, based on the damages they suffered as result of their purchases of shares of publicly traded Bumble Class A common stock ("Bumble Shares") directly in or traceable to Bumble's SPO.

Consistent with the claims asserted against Defendants in this Action, the statutory formula for the calculation of damages under Section 11(e) of the Securities Act serves as the basis for the calculation of claimant's losses under the Plan of Allocation. Under the Plan, Bumble Shares purchased directly in the SPO (at exactly $54.00 per share) and Bumble Shares "traceable" to the SPO—that is, Bumble Shares purchased in the open market during the Class Period and for which the claimant submits documentation showing that those specific shares had been issued in the SPO—will calculate to a "Recognized Loss Amount" under the Plan based on the measure of

damages provided under § 11(e) of the Securities Act. ¶ 66. The sum of a claimant's Recognized

Loss Amounts will be the Claimant's "Recognized Claim," and the Net Settlement Fund will be

allocated to Authorized Claimants on a *pro rata* basis based on the relative size of their Recognized

Claims. *Id.*

Lead Counsel believe that the Plan of Allocation provides a fair and reasonable method to

equitably allocate the Net Settlement Fund among Settlement Class Members who suffered losses

as result of the conduct alleged in the Action. Moreover, as noted above, as of June 28, 2023, more

than 85,000 copies of the Notice, which contains the Plan of Allocation and advises Settlement

Class Members of their right to object to the Plan of Allocation, had been sent out—yet no

objections to the proposed Plan have been received to date. *See* ¶¶ 62, 68; Ex. 2, ¶ 8.

## III.   THE SETTLEMENT CLASS SHOULD BE CERTIFIED

In connection with the Settlement, the Parties have stipulated to the certification of the

Settlement Class for purposes of the Settlement. As detailed in Lead Plaintiff's motion for

preliminary approval of the Settlement, the Settlement Class satisfies all the requirements of Rules

23(a) and (b)(3) of the Federal Rules of Civil Procedure. *See* ECF No. 69 at 17-23. To date, there

has been no objection to certification. Accordingly, Lead Plaintiff respectfully requests that the

Court certify the Settlement Class under Rules 23(a) and (b)(3).

## IV.   THE NOTICE TO THE SETTLEMENT CLASS SATISFIED
##        THE REQUIREMENTS OF RULE 23 AND DUE PROCESS

The Notice to the Settlement Class satisfied the requirements of Rule 23(c)(2)(B), which

requires "the best notice that is practicable under the circumstances, including individual notice to

all members who can be identified through reasonable effort." Fed. R. Civ. P. 23(c)(2)(B); *see also*

*Eisen v. Carlisle & Jacquelin*, 417 U.S. 156, 173-75 (1974). The Notice also satisfied Rule

23(e)(1), which requires that notice of a settlement be "reasonable"—*i.e.*, it must "fairly apprise

the prospective members of the class of the terms of the proposed settlement and of the options that are open to them in connection with the proceedings." *Visa*, 396 F.3d at 114.

Both the substance of the Notice and the method of its dissemination to potential members of the Settlement Class satisfied these standards. The Court-approved Notice includes all the information required by Federal Rule of Civil Procedure 23(c)(2)(B) and the PSLRA, 15 U.S.C. § 77z-1, including: (i) an explanation of the nature of the Action and the claims asserted; (ii) the definition of the Settlement Class; (iii) the amount of the Settlement; (iv) a description of the Plan of Allocation; (v) an explanation of the reasons why the Parties are proposing the Settlement; (vi) a statement indicating the attorneys' fees and costs that will be sought; (vii) a description of Settlement Class Members' right to opt-out of the Settlement Class or to object to the Settlement, the Plan of Allocation, or the requested attorneys' fees or expenses; and (viii) notice of the binding effect of a judgment on Settlement Class Members.

As noted above, in accordance with the Court's Preliminary Approval Order, the Court-approved Claims Administrator (JND), began mailing copies of the Notice Packet to potential Settlement Class Members on May 12, 2023. *See* Ex. 2, ¶¶ 3-6. As of June 28, 2023, JND has disseminated 85,389 copies of the Notice Packet to potential Settlement Class Members and nominees. *See id.* ¶ 9. In addition, JND caused the Summary Notice to be published in *Investor's Business Daily* and transmitted over the *PR Newswire* on May 22, 2023. *See id.* ¶ 10. Copies of the Notice, Claim Form, Stipulation, and Complaint were made available on the settlement website maintained by JND beginning on May 11, 2023. *See* Ex. 3 ¶ 12. This combination of individual mail to all Settlement Class Members who could be identified with reasonable effort, supplemented by notice in an appropriate, widely circulated publication, transmitted over the newswire, and set forth on internet websites, was "the best notice . . . practicable under the

circumstances." Fed. R. Civ. P. 23(c)(2)(B); *see, e.g.*, *In re Qudian Inc. Sec. Litig.,* 2021 WL 2383550, at *3 (S.D.N.Y. June 8, 2021); *In re Blue Apron Holdings, Inc. Sec. Litig.,* 2021 WL 345790, at *4 (E.D.N.Y. Feb. 1, 2021); *In re Advanced Battery Techs., Inc. Sec. Litig.*, 298 F.R.D. 171, 182-83 (S.D.N.Y. 2014).

## **CONCLUSION**

For the reasons stated in this memorandum and in the Robinson Declaration, Lead Plaintiff respectfully requests that the Court grant final approval of the proposed Settlement and approve the proposed Plan of Allocation.

Dated:  June 28, 2023

Respectfully submitted,

BERNSTEIN LITOWITZ BERGER
  & GROSSMANN LLP

*/s/ Jeremy P. Robinson*
Salvatore Graziano
Jeremy P. Robinson
William E. Freeland
1251 Avenue of the Americas
New York, NY 10020
Telephone:  (212) 554-1400
Facsimile:  (212) 554-1444
salvatore@blbglaw.com
jeremy@blbglaw.com
william.freeland@blbglaw.com

*Lead Counsel for Lead Plaintiff and the Settlement Class*

KLAUSNER, KAUFMAN, JENSEN
    & LEVINSON, P.A.
Robert D. Klausner
Stuart A. Kaufman
7080 Northwest 4th Street
Plantation, FL 33317
Telephone: (954) 916-1202
Facsimile: (954) 916-1232
bob@robertdklausner.com
stu@robertdklausner.com

*Additional Counsel for Lead Plaintiff*