**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| IN RE BUMBLE, INC.<br>SECURITIES LITIGATION | Civil Action No. 22-cv-624 (DLC)<br><br>CLASS ACTION |

**DECLARATION OF JEREMY P. ROBINSON IN SUPPORT OF:**
**(A) LEAD PLAINTIFF'S MOTION FOR FINAL APPROVAL OF SETTLEMENT**
**AND PLAN OF ALLOCATION; AND (B) LEAD COUNSEL'S**
**MOTION FOR ATTORNEYS' FEES AND LITIGATION EXPENSES**

**<u>TABLE OF CONTENTS</u>**

<u>Page</u>

I.       INTRODUCTION ........................................................................................ 4

II.      HISTORY AND PROSECUTION OF THE ACTION ............................... 9

III.     THE SETTLEMENT NEGOTIATIONS AND TERMS OF THE SETTLEMENT ........ 15

IV.      THE SERIOUS RISKS FACED IN PROSECUTING THIS ACTION .......................... 18

         1.       Risks to Proving Falsity ........................................................... 18

         2.       Risks to Proving Loss Causation and Damages ....................... 19

         3.       The Percentage Recovery of the Settlement Represents an
                  Excellent Result for the Settlement Class Given the Risks of
                  Continued Litigation ................................................................. 20

V.       PRELIMINARY APPROVAL OF THE SETTLEMENT ................................. 21

VI.      LEAD PLAINTIFF'S COMPLIANCE WITH THE COURT'S PRELIMINARY
         APPROVAL ORDER REQUIRING ISSUANCE OF NOTICE ..................................... 22

VII.     ALLOCATION OF THE PROCEEDS OF THE SETTLEMENT ................................. 24

VIII.    THE FEE AND LITIGATION EXPENSE APPLICATION ........................................... 26

         A.       The Fee Application ................................................................................. 26

                  1.       The Time and Labor Required to Achieve the Settlement ....... 27

                  2.       The Quality of the Result Achieved by Lead Counsel ............ 29

                  3.       The Skill and Experience of Plaintiff's Counsel ..................... 29

                  4.       The Fully Contingent Nature of the Fee and the Extensive Risks of
                           the Litigation ........................................................................... 30

                  5.       Lead Plaintiff's Endorsement of the Fee Application .............. 31

                  6.       The Reaction of the Settlement Class To Date ........................ 32

         B.       The Expense Application .......................................................................... 32

IX.      ADDITIONAL EXHIBITS ........................................................................................ 35

i

X.    CONCLUSION.............................................................................................................. 36

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*Bateman Eichler, Hill Richards, Inc. v. Berner*,
 472 U.S. 299 (1985) ................................................................................31

*Citiline Holdings, Inc. v. iStar Fin., Inc.*,
 No. 1:08-cv-03612-RJS, (S.D.N.Y. Apr. 5, 2013), ECF No. 127 .........................35

*Hicks v. Morgan Stanley*,
 2005 WL 2757792 (S.D.N.Y. Oct. 24, 2005) .........................................31

*In re L.G. Philips LCD Co. Sec. Litig.*,
 No. 1:07-cv-00909-RJS, (S.D.N.Y. Mar. 17, 2011), ECF No. 82 .........................35

*McGuire v. Dendreon Corp.*,
 No. 2:07-cv-00800-MJP, (W.D. Wash. Dec. 20, 2010), ECF No. 235 ..................35

*Public Pension Fund Grp. v. KV Pharm. Co.*,
 No. 4:08-cv1859, (E.D. Mo. Apr. 23, 2014), ECF No. 199 ..................................35

*SEC. Amgen Inc., v. Conn. Ret. Plans & Trust Funds*,
 568 U.S. 455 (2013) ................................................................................31

*Tellabs, Inc. v. Ma-kor Issues & Rights, Ltd.*,
 551 U.S. 308 (2007) ................................................................................31

JEREMY P. ROBINSON declares as follows:

1.     I am a partner in the law firm of Bernstein Litowitz Berger & Grossmann LLP ("BLB&G" or "Lead Counsel"), which is the Court-appointed Lead Counsel for Lead Plaintiff Louisiana Sheriffs' Pension & Relief Fund ("Louisiana Sheriffs," "Lead Plaintiff," or "Plaintiff") in the above-captioned action (the "Action").[1] I submit this declaration in support of Lead Plaintiff's Motion for Final Approval of Settlement and Plan of Allocation, and Lead Counsel's Motion for Attorneys' Fees and Litigation Expenses. I have personal knowledge of the matters set forth herein based on my active participation in the prosecution and settlement of this Action and could and would testify competently thereto.

## I.    INTRODUCTION

2.     Lead Plaintiff is pleased to present the proposed Settlement to the Court for final approval. The proposed Settlement, if approved by the Court, will resolve all claims in this securities class action in exchange for a cash payment of $18 million for the benefit of the Settlement Class. As detailed herein, the Settlement provides a significant benefit to the Settlement Class by conferring a substantial, certain, and near-term recovery. At the same time, it avoids the significant risks of continued litigation, including the risk that the Settlement Class could recover nothing at all or significantly less than the Settlement Amount after the passage of additional time. The Settlement also is the product of extensive arm's length negotiations supervised by Jed D. Melnick, Esq. of JAMS (the "Mediator"), an experienced mediator of securities class actions. As detailed herein, Lead Plaintiff respectfully submits that the $18 million cash Settlement is a favorable result for the Settlement Class given the serious risks faced in the Action, as well as the

[1] Capitalized terms not otherwise defined herein have the same meaning ascribed to them in the Stipulation and Agreement of Settlement executed on March 27, 2023 ("Stipulation"). ECF No. 68-1.

significant costs and delays that would accompany continued litigation—and should be approved in full.

3.    **The Settlement Is The Product Of Extensive Arm's Length Negotiations Supervised By An Experienced Mediator.**  The Settlement was reached only after extended arm's-length settlement negotiations supervised by the Mediator. In its August 25, 2022 lead plaintiff order (the "Order"), the Court required the Parties to "engage in mediation no later than November 2022." ECF No. 36. In connection with the Court-ordered mediation process, Lead Plaintiff and Bumble exchanged detailed mediation submissions, and held an in-person mediation session before the Mediator on November 3, 2022. Lead Plaintiff and Bumble did not reach an agreement at that meditation session. Instead, the Parties continued to litigate Defendants' motion to dismiss while engaging in months of extensive additional arm's length negotiations supervised by the Mediator. On February 6, 2023, the Parties reached a non-binding agreement to settle the Action for $18 million in cash, which was conditioned on Lead Plaintiff confirming the fairness, reasonableness, and adequacy of the proposed Settlement based on negotiated confidential discovery to be provided by Bumble. After Lead Counsel's team of attorneys reviewed and analyzed the confidential discovery provided by Bumble, the Settlement was finalized with the execution of the Stipulation on March 27, 2023.

4.    **Lead Plaintiff's And Lead's Counsel's Zealous Advocacy And Effort.**  The proposed Settlement is also the result of Lead Plaintiff's and Lead Counsel's zealous advocacy and litigation efforts on behalf of the Settlement Class. Among other things, Lead Plaintiff and Lead Counsel (i) conducted an extensive investigation, including interviewing multiple former Bumble employees and thoroughly reviewing the Offering Documents, other SEC filings, investor conference calls, press releases, media reports, and other public information; (ii) researched,

drafted and filed a detailed Complaint setting forth Plaintiff's claims for violations of the Securities Act; (iii) researched and briefed Defendants' extensive Motion to Dismiss the Complaint; (iv) consulted with two experts—one testifying expert and one consulting damages expert; (v) prepared detailed mediation submissions on issues of liability and damages—and reviewed Bumble's submissions; (vi) prepared for and participated in an in-person mediation session conducted by the Mediator; (vii) engaged in months of arm's length settlement negotiations supervised by the Mediator; and (viii) reviewed and analyzed many thousands of pages of confidential discovery produced by Bumble in connection with the mediation. As a result, Lead Plaintiff and Lead Counsel were well informed as to the strengths and weaknesses of the claims and defenses when they entered into the Settlement.

5.     In particular, the confidential discovery undertaken by Lead Counsel before entering into the Stipulation allowed Lead Plaintiff and Lead Counsel to confirm that the $18 million Settlement is fair, reasonable, and adequate given the risks of the case. Lead Counsel's review and analysis of the over 42,000 pages of confidential documents produced by Bumble provided a more thorough understanding of the facts and risks of the case and Defendants' arguments. This further supports the conclusion that the Settlement is fair and reasonable.

6.     **The Significant Risks Faced In The Litigation.**  In considering whether to enter the Settlement, Lead Plaintiff and Lead Counsel weighed the $18 million Settlement Amount against the strength of Lead Plaintiff's claims, taking into consideration the risks inherent in proving liability and recoverable damages, as well as the expense and likely duration of continued litigation. This was not a case where Bumble had restated its financial statements—nor where there was a parallel SEC investigation or a governmental inquiry into the alleged misstatements. To the contrary, Lead Plaintiff and Lead Counsel were the only ones pursuing a recovery for the benefit

of the Settlement Class for the misstatements at issue. In that regard, the Action presented many significant risks to establishing both liability and damages that could have resulted in no recovery at all for the Settlement Class. Indeed, at the time that the Parties agreed to settle the Action, Defendants' Motion to Dismiss was still pending. Although Lead Plaintiff and Lead Counsel believe that they had compelling arguments in response to the Motion to Dismiss, there was a significant risk that the Court might have ruled in Defendants' favor, which would have dramatically reduced, or eliminated altogether, the potential recovery for the Settlement Class. To be sure, an adverse ruling on the Motion to Dismiss would have stopped this case in its tracks at the pleading stage without any recovery at all for investors.

7.      In terms of the substance of its claims, Lead Plaintiff faced significant risk in establishing that Defendants made materially false and misleading statements in Bumble's SPO Offering Documents. For their part, Defendants vehemently denied that Bumble made any actionable false statements in its SPO. For example, Defendants argued in their Motion to Dismiss that the Company's affirmative statements about its "growth" were not misleading, including because they concerned the overall Bumble user community and not paying users specifically. Defendants also argued that certain alleged misrepresentations were opinion statements that were not actionable because no facts showed they were not actually held or otherwise misleading. Defendants further asserted that the risk statements challenged by Plaintiff were either not misleading because the risks warned of had not materialized or because those risks that *had* materialized had been previously disclosed such that the market knew the truth and could not have been misled.

8.      Further, Defendants argued that the SPO Offering Documents' presentation of Bumble's historical data about paying users on the Bumble and Badoo Apps was not misleading

or even actionable because accurate historical data cannot support a securities claim as a matter of law. Defendants also vigorously argued that the allegedly omitted information—an intra-quarter decline in total paying users and related metrics—was not remotely material. Relatedly, they pointed to Bumble's actual quarter-end financial results for the quarter in which the SPO occurred to argue that they were overall positive.

9.     Moreover, even if Lead Plaintiff *had* succeeded in proving that the statements in the SPO Offering Documents *were* misleading, all Defendants (other than Bumble) would have argued that they were not liable because they exercised reasonable care in conducting due diligence into the Offering Documents' accuracy and completeness. Defendants also would have pursued a "negative causation" defense, arguing that the alleged stock price declines were not caused by any allegedly false statement. If Defendants had succeeded on any of these defenses, any recovery for the Settlement Class would have been substantially reduced or even eliminated entirely.

10.     In all events, even assuming Lead Plaintiff was successful in defeating Defendants' pending Motion to Dismiss, which was far from certain, Lead Plaintiff faced the substantial risks and delays attendant to litigating the case through discovery, class certification, summary judgment motions, trial, and likely appeals—a process that could extend for years with no assurance of any (let alone a better) recovery. The proposed $18 million Settlement thus represents a very favorable "bird in the hand" that warrants final Court approval.

11.     As discussed in further detail below, the proposed Plan of Allocation, which was developed with the assistance of Lead Plaintiff's consulting damages expert, provides for the equitable distribution of the Net Settlement Fund to Settlement Class Members who submit Claims that are approved for payment by the Court on a *pro rata* basis.

12.     Plaintiff's Counsel[2] prosecuted this Action on a fully contingent basis and advanced all litigation-related expenses, and thus exclusively bore the risk of an unfavorable result. For their efforts in achieving the Settlement, Lead Counsel, on behalf of Plaintiff's Counsel, requests attorneys' fees in the amount of 25% of the Settlement Fund, and payment of the litigation expenses that Lead Counsel incurred in connection with the institution, prosecution, and settlement of the Action. Lead Counsel respectfully submits that the requested fee of 25% of the Settlement Fund is fair and reasonable in light of the efforts of Plaintiff's Counsel, the result achieved in the Action, and the risks and complexity of the litigation.

13.     Lead Counsel also respectfully submits that the expenses it incurred in litigating this Action—$83,125.85—were reasonably incurred in prosecuting and resolving the Action for the benefit of the Settlement Class and warrant approval.

## II.     HISTORY AND PROSECUTION OF THE ACTION

14.     On January 24, 2022, a securities class action was commenced in this District, which asserted claims against Bumble, its directors and officers, Bumble's co-owner Blackstone Group Inc., and the underwriters of the registered secondary public offering by Bumble in September 2021, for violations of Sections 11, 12(a)(2), and 15 of the Securities Act of 1933 (the "Securities Act"), 15 U.S.C. §§ 77k, 77l, 77o. ECF No. 1.

15.     On March 25, 2022, Louisiana Sheriffs and one other movant timely filed motions seeking appointment as lead plaintiff. *See* ECF Nos. 18, 21. Louisiana Sheriffs' motion also sought the appointment of BLB&G as Lead Counsel. Throughout the Action, BLB&G served as Lead Counsel to Louisiana Sheriffs and the putative class. Louisiana Sheriffs' fiduciary counsel—the

---

[2] "Plaintiff's Counsel" consist of Lead Counsel BLB&G and fiduciary counsel for Lead Plaintiff, Klausner, Kaufman, Jensen & Levinson, P.A. ("Klausner Kaufman").

law firm of Klausner Kaufman—was also involved from the outset and contributed by advising and coordinating with Louisiana Sheriffs throughout the litigation.

16.    On April 8, 2022, Louisiana Sheriffs and the competing movant filed their respective opposition briefs. *See* ECF Nos. 26, 27. In its opposition brief, the competing movant argued that Louisiana Sheriffs should not be appointed as lead plaintiff because "while at first glance [Louisiana Sheriffs] claims to have suffered a numerically larger loss, upon closer inspection, that loss was inflated" by the inclusion of "[p]ost-offering purchases." ECF No. 26 at 1. As such, the competing movant impugned Louisiana Sheriffs' straightforward and accurate application of LIFO to calculate losses at the lead plaintiff stage, and wrongly accused Louisiana Sheriffs of engaging in "sleight of hand" or advancing a "novel approach" to calculating losses. *Id.* at 1, 5. The competing movant also submitted a declaration from an expert purportedly supporting its arguments. *See* ECF No. 28-3.

17.    Given these attacks—which argued for the application of financial tests ***other*** than the method preferred by courts in this District and nationwide at the lead plaintiff stage—Louisiana Sheriffs and BLB&G had to retain a financial economics expert. To that end, they retained Michael Hartzmark, Ph.D.—an experienced financial economist—as a testifying expert to submit a rebuttal expert report.

18.    On April 15, 2022, Louisiana Sheriffs filed its reply brief in connection with its motion for appointment as lead plaintiff. *See* ECF No. 30. Louisiana Sheriffs also filed a 22-page expert report from Dr. Hartzmark, who defended Louisiana Sheriffs' loss calculations as appropriate and explained how the competing movant's expert was effectively applying a different financial test than the one commonly employed at the lead plaintiff stage. *See* ECF No. 31-1. The

competing movant also filed a reply brief in further support of its motion seeking appointment as lead plaintiff. *See* ECF No. 29.

19.     On August 25, 2022, the Court held oral argument on the pending motions seeking appointment as lead plaintiff. At the hearing, and as later expressed in the Court's August 25, 2022 Order, the Court, among other things, appointed Louisiana Sheriffs as Lead Plaintiff pursuant to the Private Securities Litigation Reform Act of 1995 and approved Louisiana Sheriffs' selection of BLB&G as Lead Counsel. *See* the Order, ECF No. 36. As discussed in greater detail below, Court also ordered the parties to engage in mediation by November 2022. *Id.*

20.     Prior to and following the Order, Lead Plaintiff and BLB&G had continued their extensive investigation into the claims and potential claims against Bumble, which had begun prior to filing of the motion seeking appointment as lead plaintiff in March 2022. Among other things, BLB&G reviewed a substantial volume of materials authored, issued, or presented by Bumble, including Bumble's periodic financial reports, its voluminous filings with the SEC, conference call transcripts, registration statements, prospectuses, press releases, investor presentations, and other public communications issued during the relevant time period at issue and beyond.

21.     BLB&G also reviewed hundreds of news articles, securities analyst reports, and market commentary reports concerning Bumble in order to gauge the impact of Defendants' statements on the marketplace. Given that multiple analysts followed Bumble and the Company garnered significant analyst and media attention prior to and during the relevant time period at issue, the volume of these materials was substantial.

22.     Further, BLB&G retained a consulting damages expert to study damages and loss causation.

23.     In addition, BLB&G conducted extensive interviews with numerous former Bumble employees, which aided BLB&G in drafting the Complaint. All told, BLB&G reached out to 179 individuals and spoke with 22 former Bumble employees. For those former Bumble employees who requested representation by independent counsel, BLB&G covered their legal fees incurred in connection with this case. In that regard, BLB&G referred such former Bumble employees to attorney Frank Schirripa. In addition to this factual research, BLB&G researched Second Circuit law applicable to the claims asserted and Defendants' potential defenses thereto.

24.     On October 7, 2022, Plaintiff filed the Consolidated Amended Class Action Complaint (the "Complaint"). *See* ECF No. 42. The Complaint asserted the following claims:

- Section 11 of the Securities Act, against Defendants Bumble, Herd, Subramanian, Mather, Anderson, Atchison, Bavishi, Bromberg, Griffin, Korngold, Morgan, Steele, Thomas-Graham, and the Underwriter Defendants;

- Section 12(a)(2) of the Securities Act, against Defendants Bumble and the Underwriter Defendants; and

- Section 15 of the Securities Act, against the Blackstone Defendants and Defendants Herd and Subramanian.

Both the Court-appointed Lead Counsel, BLB&G, and fiduciary counsel to Louisiana Sheriffs, Klausner Kaufman, were specifically listed as counsel in the Complaint's signature block.

25.     The Complaint alleged that Defendants made materially false and misleading statements and omissions with respect to, among other things, Bumble's business and financial performance. Specifically, the Complaint alleged that Bumble made representations about growth in paying users across its two primary dating apps, the Bumble App and the Badoo App. The Complaint further alleged that, when Bumble launched its secondary public offering or SPO,

investors relied on statements in the Company's registration statement concerning growth in paying users, including that it observed an "increasing propensity for users to pay," that it "expect[ed] to increase paying users," and that its community was "growing." The Complaint also alleged that Bumble made risk statements that treated as hypothetical the risk of slowing or declining paying user growth when it was allegedly already happening during the quarter that Bumble conducted the SPO. The Complaint also alleged that Defendants omitted material information from the SPO Offering Documents by not disclosing that it was suffering from a decline in paying users, which was required to be disclosed under Item 3030 of SEC Regulation S-K. Further, the Complaint alleged control person claims against the Executive and Blackstone Defendants.

26.    On November 18, 2022, Defendants filed their motion to dismiss the Complaint ("Motion to Dismiss"). *See* ECF No. 47. In the Motion to Dismiss, Defendants argued that the Complaint should be dismissed because Bumble had not made a single actionable misstatement in its SPO Offering Documents. In particular, Defendants argued that:

a)    Bumble's statements about growth were not misleading because those statements were made in the context of the overall Bumble user community as a whole—which they said *was* growing—and not in the limited context of paying users in particular;

b)    Bumble's statements about its expectations for future growth were not actionable because they were opinion statements that were actually held and were not accompanied by untrue facts;

c)    Bumble's presentation of historical results data was not misleading or actionable because the data were accurate, which cannot support a securities claim;

d)    Bumble's risk disclosures were not misleading because the risks warned of had not materialized or, for those risks that *had* materialized, the risks had been previously disclosed such that the market knew the truth and could not have been misled;

e)    The allegedly omitted information—an intra-quarter decline in total paying users and related metrics—was not material, as demonstrated by Bumble's strong financial results during the quarter in which the SPO occurred;

f)    Plaintiff's Item 303 claim failed because Bumble had no obligation to disclose immaterial information concerning an intra-quarter decline in paying users, which did not qualify as a trend; and

g)    Plaintiff's remaining Securities Act claims failed because Bumble was not a statutory seller and the Blackstone Defendants were not sufficiently alleged to be control persons.

In sum, Defendants argued that, under the law and the facts, the Complaint should be dismissed in its entirety with prejudice for failure to state a claim.

27.    Lead Counsel conducted extensive research to respond to Defendants' arguments in the Motion to Dismiss.

28.    On December 16, 2022, Louisiana Sheriffs and BLB&G filed a memorandum of law in opposition to the Motion to Dismiss. *See* ECF No. 51. In response, Louisiana Sheriffs and BLB&G argued that:

a)    Bumble's SPO misleadingly touted an "increasing propensity for users to pay" when, in reality at the time, Bumble's paying user numbers were declining, which was misleading regardless of whether the statement was treated as an opinion statement;

b)      Bumble's risk statements presented the prospect of Bumble suffering a decline in paying users as a hypothetical possibility—when that reality had already materialized at the time of the SPO;

c)      Bumble omitted from the SPO Offering Documents that it had suffered a decrease in paying users—which Defendants had a duty to disclose under Item 303;

d)      Defendants' materiality and "truth-on-the-market" challenges failed;

e)      Bumble's historical data were misleading because they omitted and helped conceal the declines in paying user numbers; and

f)      the Complaint adequately pled Section 12 claims against Bumble and Section 15 control person claims against the Blackstone Defendants.

Accordingly, Lead Plaintiff and Lead Counsel argued that the Motion to Dismiss should be denied.

29.     On January 13, 2022, Defendants filed their reply memorandum of law. *See* ECF No. 55. Defendants continued to insist that Bumble had not made any misleading, material or otherwise actionable misstatements in the SPO Offering Documents.

30.     Defendants' Motion to Dismiss was fully briefed and still pending when the Settlement was ultimately agreed to by the Parties, as described below.

## III.    THE SETTLEMENT NEGOTIATIONS AND TERMS OF THE SETTLEMENT

31.     As noted above, in its August 25, 2022 Order appointing Lead Plaintiff and Lead Counsel, the Court ordered that the Parties must "engage in mediation no later than November 2022." ECF No. 36.

32.     Pursuant to the Court's order, in early September 2022, the Parties retained the Mediator (Mr. Melnick, Esq.) to assist them with and supervise the Court-ordered mediation process. As noted, Mr. Melnick is a well-known neutral with extensive experience in mediating

and resolving securities class actions. After various discussions, the Parties and the Mediator scheduled an in-person mediation session for November 3, 2022.

33.     On October 25, 2022, Lead Plaintiff and Bumble exchanged and submitted to the Mediator detailed, confidential mediation statements addressing the merits of the case, including *inter alia* liability and damages.

34.     On November 3, 2022, the Parties and their counsel participated in a formal, full-day mediation session before the Mediator. The mediation was conducted in-person and was attended by (i) Lead Counsel, with a representative of Lead Plaintiff's fiduciary counsel, Klausner Kaufman, attending remotely; (ii) Counsel for Bumble, the Executive Defendants, the Director Defendants, the Blackstone Defendants and Blackstone Securities Partners L.P., Simpson Thacher & Bartlett LLP; (iii) a representative of Bumble; and (iv) representatives of Bumble's various directors' and officers' liability insurance carriers.

35.     During the mediation session, the Parties made presentations to the Mediator and discussed the merits of the case, including liability and damages. Lead Plaintiff and Bumble engaged in vigorous, arm's length settlement negotiations throughout the in-person mediation session supervised by the Mediator. The November 3 mediation session ended, however, without any resolution.

36.     Although the mediation session ended without a settlement agreement, periodically throughout the briefing of Defendants' Motion to Dismiss and over the next few months, Lead Plaintiff and Bumble continued to negotiate regarding a possible resolution of the Action with the assistance and oversight of the Mediator. Following extensive arm's length negotiations under the Mediator's supervision, on February 6, 2023—three months after the in-person mediation

session—the Parties executed a non-binding term sheet (the "Term Sheet") memorializing certain proposed terms on which to settle the Action.

37.     The Term Sheet set forth, among other things, Lead Plaintiff's agreement to settle and release all claims against Defendants in return for a cash payment of $18 million for the benefit of the Settlement Class, subject to certain terms and conditions and the execution of a customary "long form" stipulation and agreement of settlement and related papers. The non-binding agreement was further conditioned on Lead Plaintiff and Lead Counsel confirming the fairness, reasonableness, and adequacy of the proposed Settlement based on confidential discovery to be provided by Bumble concerning the facts, issues, and events alleged in the Complaint.

38.     Bumble commenced its production of confidential documents on February 8, 2023—and completed the production on February 17, 2023. In connection with discovery, Bumble produced a total of 42,625 pages of documents concerning the facts, issues, and events at issue. Lead Counsel's team of attorneys reviewed and analyzed these productions. Lead Counsel's review and analysis of these productions added to Lead Counsel's already-thorough understanding of the facts and risks of the case, and further confirmed Lead Plaintiff's and Lead Counsel's determination that the Settlement is fair, reasonable, and adequate to the Settlement Class.

39.     After execution of the Term Sheet, and while Lead Counsel's review of the confidential discovery was ongoing, the Parties spent additional weeks negotiating the terms of the Settlement as embodied in the Stipulation and the exhibits thereto, and exchanged multiple drafts of the Stipulation and its exhibits. On March 27, 2023, the Parties entered into the Stipulation and Agreement of Settlement, which sets forth the final terms and conditions of the Settlement.

40.     Under the Settlement, Bumble has caused a cash payment of $18 million to be deposited into escrow for the benefit of the Settlement Class, and upon the Settlement becoming effective, the Parties will provide mutual releases, as defined in the Stipulation.

## IV.     THE SERIOUS RISKS FACED IN PROSECUTING THIS ACTION

41.     Although Lead Plaintiff and Plaintiff's Counsel filed and prosecuted the securities claims at issue in this Action fully believing in their merit, Defendants raised several challenges to each element of Lead Plaintiff's claims that posed significant risks that Defendants could prevail at any of the motion to dismiss, summary judgment, or trial stages. If Defendants had prevailed at any of these stages, it would have reduced or even eliminated altogether the possibility of any recovery for the benefit of the Settlement Class. Also, from a "big picture" perspective, the risks of this Action were heightened because it did not have certain obvious badges of misconduct that can provide significant tailwinds for securities class action claims. For example, there was no parallel government enforcement action against Bumble that Lead Plaintiff could use to support its case. Further, Bumble did not issue any restatement of its financial results relevant to the Action. Given these risks, Lead Plaintiff and Lead Counsel strongly believe—and respectfully submit— that the proposed Settlement is firmly in the best interests of the Settlement Class.

### 1.     Risks to Proving Falsity

42.     Lead Plaintiff faced challenges in proving that there were materially false and misleading statements in the SPO Offering Documents. Among other things, Defendants argued in their Motion to Dismiss that the Company's affirmative statements about its "growth" were made in the context of the overall Bumble user community as a whole and not in the limited context of paying users—and, thus, the growth-related statements were not misleading, far less materially so.

43. Defendants also argued that certain challenged representations were opinion statements that were not actionable because the Complaint did not adequately allege that these opinions were not actually held or that they were accompanied by untrue facts.

44. Defendants also insisted that the challenged risk statements were not misleading. To that end, Defendants asserted that the risks warned of had either not materialized—so there was nothing misleading about the statements—or, if the relevant risks *had* materialized, those risks had been previously disclosed by Defendants such that the market knew the truth and could not have been misled. Defendants further argued that the SPO Offering Documents' presentation of Bumble's historical data about paying users on the Bumble App and Badoo App was not misleading because accurate historical data cannot support a securities claim.

45. In addition, Defendants argued that the information that Lead Plaintiff alleged should have been disclosed—the intra-quarter decline in total paying users and related metrics—was not material. In that regard, Defendants pointed to Bumble's actual quarter-end financial results for the quarter in which the SPO occurred to argue that they were overall positive.

46. In sum, Lead Plaintiff faced significant risk in establishing that Defendants made materially false and misleading statements in Bumble's SPO Offering Documents.

## 2. Risks to Proving Loss Causation and Damages

47. In addition, Lead Plaintiff faced significant risks in establishing Class-wide damages. Had this case continued, Defendants would certainly have pursued a "negative causation" defense by arguing that declines in the price of Bumble Class A common stock were caused by factors *other* than an alleged revelation of the truth concerning the alleged misstatements. All Defendants (other than Bumble) would have also argued that they were not liable because they exercised reasonable care in conducting due diligence into the Offering Documents' accuracy and completeness. Assuming Lead Plaintiff were successful in defeating

Defendants' pending Motion to Dismiss, which was uncertain, Lead Plaintiff would still have had to prevail at several stages, including motions for summary judgment, a trial, and, if they prevailed on those, on the appeals that were likely to follow. Thus, there were significant risks and delays attendant to the continued prosecution of the claims against Defendants.

*                    *                    *

48.     In sum, while Lead Plaintiff disputed Defendants' arguments on falsity, loss causation, and damages, there was a significant risk that the Court or a jury could decide for Defendants on one, some, or all of them. If so, damages would have been significantly reduced or even eliminated altogether, which would have diminished or foreclosed any chance of achieving a recovery for the Settlement Class.

49.     The Settlement is therefore in the best interests of the Settlement Class because it provides Settlement Class Members a guaranteed, prompt, and significant financial recovery without the serious risk or extended delay that would accompany continued litigation.

### 3.     The Percentage Recovery of the Settlement Represents an Excellent Result for the Settlement Class Given the Risks of Continued Litigation

50.     The Settlement is also reasonable in light of the maximum damages that could be reasonably established at trial. Lead Plaintiff's consulting damages expert has estimated that the absolute *maximum* theoretically possible damages amount available for the Settlement Class's Section 11 claims is approximately $369 million. Importantly, this theoretical maximum damage figure assumes Lead Plaintiff's *complete success* in establishing Defendants' liability and damages, and assumes that Defendants' negative causation arguments would be completely rejected. Accounting for Defendants' likely negative causation arguments, Lead Plaintiff's consulting damages expert calculated that the reasonably likely maximum damages would be approximately $180 million. The $18 million Settlement therefore represents 4.9% of the absolute

theoretical maximum provable damages and 10% of the reasonably likely maximum provable damages—either of these percentage of recovery figures represents a superior result in the face of significant litigation risk.

51.     From Defendants' perspective, the maximum damages at issue were dramatically lower than the amounts estimated by Plaintiff's consulting damages expert. Indeed, Defendants argued vigorously throughout the litigation that there were recoverable damages at all and the Settlement Class was not entitled to recover anything. Defendants would have also attacked Lead Plaintiff's damages calculations, arguing that if any damages are legitimately recoverable at all (which was disputed) then they should be significantly lower than Lead Plaintiff's estimates.

## V.    PRELIMINARY APPROVAL OF THE SETTLEMENT

52.     On March 31, 2023, Lead Plaintiff filed its Unopposed Motion for Preliminary Approval of Settlement and Approval of Notice to the Settlement Class ("Preliminary Approval Motion"), which included a copy of the Stipulation, a memorandum in support, and copies of the proposed notice materials to be sent to Settlement Class Members to inform them of the Settlement and their options to participate in it, exclude themselves from the Settlement Class, or object. ECF Nos. 68-70.

53.     On April 5, 2023, the Court held a telephonic conference where it requested modifications to the notice materials. On April 13, 2023, Lead Plaintiff filed revised versions of proposed Preliminary Approval Order, Notice, and Summary Notice to comply with the Court's instructions provided during the April 5, 2023 telephonic conference. ECF No. 73.

54.     On April 14, 2023, the Court entered an Order granting preliminary approval of the Settlement. ECF No. 75.

55.     On April 14, 2023, the Court entered an Order setting the Settlement Fairness Hearing for August 4, 2023 and approving Lead Plaintiff's proposed deadlines for mailing the

Notice and Claim Form to Settlement Class Members; publishing the Summary Notice; filing opening and reply papers in support of final approval of the Settlement, Plan of Allocation, and Lead Counsel's motion for attorneys' fees and expenses; submitting objections or requests for exclusion from the Settlement Class; and submitting Claim Forms. ECF No. 75, at 2. On April 14, 2023, the Court also entered the Preliminary Approval Order preliminarily approving the Settlement and finding that "it will likely be able to finally approve the Settlement under Rule 23(e) as fair, reasonable, an adequate so the Settlement Class, subject to further consideration at the Settlement Fairness Hearing." ECF No. 75, at 4-5.

## VI.    LEAD PLAINTIFF'S COMPLIANCE WITH THE COURT'S PRELIMINARY APPROVAL ORDER REQUIRING ISSUANCE OF NOTICE

56.    In accordance with the Preliminary Approval Order, Lead Counsel instructed JND, the Court-approved Claims Administrator, to disseminate copies of the Notice and Claim Form by mail and to publish the Summary Notice. The Court-approved Notice contains, among other things, a description of the Action, the Settlement, the proposed Plan of Allocation, and Settlement Class Members' rights to participate in the Settlement, to object to the Settlement, the Plan of Allocation, or Lead Counsel's application for an award of attorneys' fees and expenses (the "Fee and Expense Application"), or to exclude themselves from the Settlement Class.

57.    The Notice also informs Settlement Class Members of Lead Counsel's intent to apply for an award of attorneys' fees in an amount not to exceed 25% of the Settlement Fund and for payment of Plaintiff's Counsel's Litigation Expenses in an amount not to exceed $200,000, including reimbursement of the reasonable costs and expenses incurred by Lead Plaintiff directly related to its representation of the Settlement Class.

58.    To disseminate the Notice, JND obtained information from Bumble and from banks, brokers, and other nominees regarding the names and addresses of potential Settlement

Class Members. *See* Declaration of Luiggy Segura Regarding: (A) Mailing of the Notice and Claim Form; (B) Publication of the Summary Notice; and (C) Report on Requests for Exclusion Received to Date (the "Segura Decl."), attached as Exhibit 2, at ¶¶ 3-5.

59.     On May 12, 2023, JND mailed 4,651 copies of the Notice and Claim Form (together, the "Notice Packet") to potential Settlement Class Members and nominees by first-class mail. *See* Segura Decl. ¶ 6. Through June 28, 2023, JND has disseminated 85,389 Notice Packets. *Id.* at ¶ 9.

60.     On May 22, 2023, in accordance with the Preliminary Approval Order, JND caused the Summary Notice to be published in *Investor's Business Daily* and transmitted over the PR Newswire on May 22, 2023. *See id.* ¶ 10.

61.     Lead Counsel also caused JND to establish a dedicated settlement website, www.BumbleSecuritiesLitigation.com, to provide potential Settlement Class Members with information concerning the Settlement and access to downloadable copies of the Notice and Claim Form, as well as copies of the Stipulation, Preliminary Approval Order, and Complaint. *See id.* at ¶ 12.

62.     Under the Court's April 14, 2023 orders, the deadline for Settlement Class Members to file objections to the Settlement, the Plan of Allocation, and/or the Fee and Expense Application, or to request exclusion from the Settlement Class, is July 12, 2023. To date, no objections to the Settlement, Plan of Allocation, or Lead Counsel's Fee and Expense Application, and no requests for exclusion from the Settlement Class, have been received. *See id*. Lead Plaintiff will file reply papers in support of final approval of the Settlement on July 26, 2023, after the deadline for submitting requests for exclusion and objections has passed, and will address any objections or requests for exclusion.

## VII.    ALLOCATION OF THE PROCEEDS OF THE SETTLEMENT

63.    In accordance with the Court's April 14, 2023 orders, and as provided in the Notice, all Settlement Class Members who want to participate in the distribution of the Net Settlement Fund—i.e., the Settlement Fund less (i) any Taxes, (ii) any Notice and Administration Costs, (iii) any Litigation Expenses awarded by the Court, (iv) any attorneys' fees awarded by the Court, and (v) any other costs or fees approved by the Court—must submit a valid Claim Form with all required information postmarked, or submitted through the Settlement website, no later than September 11, 2023. As provided in the Notice, the Net Settlement Fund will be distributed among Settlement Class Members according to the plan of allocation approved by the Court.

64.    The proposed plan of allocation (the "Plan of Allocation" or the "Plan") is set forth in Appendix A to the Notice. If approved, the Plan of Allocation will govern how the Net Settlement Fund will be distributed among Authorized Claimants.[3] The proposed Plan of Allocation is designed to achieve an equitable and rational distribution of the Net Settlement Fund. However, it is not a formal damages analysis, and the calculations made pursuant to the Plan are not intended to measure the amounts that Settlement Class Members would recover after a trial.

65.    Lead Counsel developed the Plan of Allocation in consultation with Lead Plaintiff's expert consultant on damages and his team. The Plan creates a framework for equitable distribution of the Net Settlement Fund among Settlement Class Members based on the damages they suffered as result of their purchases of shares of publicly traded Bumble Class A common stock ("Bumble Shares") directly in or traceable to Bumble's SPO.

---

[3] An "Authorized Claimant" means a Settlement Class Member who or that submits a Claim to the Claims Administrator that is approved by the Court for payment from the Net Settlement Fund.

66.     Consistent with the claims asserted against Defendants in this Action, the statutory formula for the calculation of damages under Section 11(e) of the Securities Act serves as the basis for the calculation of claimant's losses under the Plan of Allocation. Under the Plan, Bumble Shares purchased directly in the SPO (at exactly $54.00 per share) and Bumble Shares "traceable" to the SPO—that is, Bumble Shares purchased in the open market during the Class Period and for which the claimant submits documentation showing that those specific shares had been issued in the SPO—will calculate to a "Recognized Loss Amount" under the Plan based on the measure of damages provided under § 11(e) of the Securities Act. The sum of a claimant's Recognized Loss Amounts will be the Claimant's "Recognized Claim," and the Net Settlement Fund will be allocated to Authorized Claimants on a *pro rata* basis based on the relative size of their Recognized Claims. *Id*.

67.     In sum, the Plan of Allocation is designed to fairly and rationally allocate the proceeds of the Net Settlement Fund among Settlement Class Members based on losses they suffered on transactions in Bumble Shares that were attributable to the conduct alleged in the Complaint. Accordingly, Lead Counsel respectfully submits that the Plan of Allocation is fair and reasonable, and should be approved by the Court.

68.     As noted above, as of June 28, 2023, a total of 85,389 copies of the Notice, which contains the Plan of Allocation and advises Settlement Class Members of their right to object to the proposed Plan of Allocation, were sent to potential Settlement Class Members and their nominees. *See* Segura Decl. ¶ 9. To date, no objections to the proposed Plan of Allocation have been received.

## VIII.    THE FEE AND LITIGATION EXPENSE APPLICATION

69.    In addition to seeking final approval of the Settlement and Plan of Allocation, Lead Counsel is applying to the Court for an award of attorneys' fees on behalf of all Plaintiff's Counsel, and for payment of Lead Counsel's Litigation Expenses.

70.    Specifically, Lead Counsel is applying to the Court, on behalf of all Plaintiff's Counsel (both BLB&G and Klausner Kaufman), for a fee award of 25% of the Settlement Fund, which equates to $4,500,000, plus interest earned at the same rate as earned by the Settlement Fund (the "Fee Application").

71.    Lead Counsel also requests payment for Litigation Expenses that BLB&G incurred in connection with the prosecution of the Action from the Settlement Fund in the amount of $83,125.85 (the "Expense Application").

72.    In connection with the Expense Application, Lead Counsel further requests payment to Lead Plaintiff of $1,944.00 for recoverable costs and expenses that Lead Plaintiff incurred directly related to its representation of the Settlement Class, in accordance with the PSLRA, 15 U.S.C. § 78u-4(a)(4).

73.    Based on the factors discussed below, and on the legal authorities set forth in the accompanying Memorandum of Law in Support of Lead Counsel's Motion for Attorneys' Fees and Litigation Expenses (the "Fee Memorandum") being filed contemporaneously herewith, I respectfully submit that Lead Counsel's motion for fees and expenses should be granted.

### A.    The Fee Application

74.    For their efforts on behalf of the Settlement Class, Lead Counsel is applying, on behalf of all Plaintiff's Counsel, for a fee award to be paid from the Settlement Fund on a percentage basis. As set forth in the accompanying Fee Memorandum, the percentage method is the appropriate method of fee recovery because it aligns the lawyers' interest in being paid a fair

fee with the interest of Lead Plaintiff and the Settlement Class in achieving the maximum recovery in the shortest amount of time required under the circumstances, and appropriately takes into account the litigation risks faced in a class action.

75.    Based on the favorable result achieved, the extent and quality of the work performed, the significant risks of the litigation, and the fully contingent nature of the representation, Lead Counsel respectfully submits that the requested fee award is reasonable and should be approved. Indeed, as discussed in the Fee Memorandum, a 25% fee award is fair and reasonable for attorneys' fees in common fund cases such as this, and is well within the range of reasonable percentages awarded in securities class actions in this Circuit for cases that have settled for a similar amount as here.

### 1.    The Time and Labor Required to Achieve the Settlement

76.    As defined above, Plaintiff's Counsel are BLB&G, the Court-appointed Lead Counsel, and Klausner Kaufman, fiduciary counsel for Lead Plaintiff Louisiana Sheriffs. Both BLB&G and Klausner Kaufman were specifically listed as counsel on the signature page in the Complaint.

77.    The time and labor expended by Plaintiff's Counsel in pursuing this Action and achieving the Settlement strongly demonstrate the reasonableness of the requested fee. Attached here as Exhibits 3A and 3B are declarations of each of the Plaintiff's Counsel firms which include summaries of the amount of time spent by attorneys and professional support staff employees of the firms on this Action from its inception through March 27, 2023 (the date of execution of the Stipulation), and a lodestar calculation based on their current hourly rates.

78.    As set forth on Exhibit 3, the total number of hours expended by Plaintiff's Counsel on this Action from its inception through March 27, 2023 is 4,896.25, for a total lodestar of

$2,530,068.75. The vast majority of the total lodestar—approximately 98%—was incurred by Lead Counsel.

79.    The requested fee of 25% of the Settlement Fund represents $4,500,000 (plus interest accrued at the same rate as the Settlement Fund), and therefore represents a multiplier of approximately 1.78 on Plaintiff's Counsel's lodestar. As discussed in further detail in the Fee Memorandum, the requested multiplier is well within the range of fee multipliers typically awarded in comparable securities class actions and in other class actions in this Circuit involving significant contingency-fee risk.

80.    As set forth in Exhibits 3A and 3B, the schedules included in those exhibits setting forth the hours worked by the attorneys and professional staff on this Action were created from contemporaneous daily time records regularly prepared and maintained by the respective Plaintiff's Counsel. Moreover, as noted above, neither of the Plaintiff's Counsel firms has submitted any time incurred after March 27, 2023—the date that the Stipulation was executed—even though Lead Counsel has expended additional time arguing the preliminary approval motion and preparing and filing papers in support of final approval. Moreover, if the Settlement is approved, Lead Counsel will continue to expend additional time for many months monitoring and overseeing the administration of the Settlement and distribution of payment to Settlement Class Members—time for which Plaintiff's Counsel will not seek any additional compensation.

81.    The hourly rates for the attorneys and professional support staff included in the schedules are their current hourly rates, which are comparable to rates that have been accepted by the courts for purposes of reviewing the "lodestar value" of the relevant firm's time for purposes of conducting a "lodestar cross-check" (and calculating associated "fee multipliers") in other contingent class action cases. For personnel who are no longer employed by Plaintiff's Counsel,

the lodestar calculation is based upon the hourly rates for such personnel in their final year of employment.

82.    As detailed above, throughout this case, Plaintiff's Counsel devoted substantial time to the prosecution of this Action. BLB&G, as Lead Counsel, maintained control of and monitored the work performed by the lawyers on this case. While I personally devoted substantial time to this case, other highly experienced and knowledgeable attorneys at my firm assisted in all aspects of the case as needed. More junior attorneys and paralegals also assisted in working on matters appropriate to their skill and experience levels.

### 2.    The Quality of the Result Achieved by Lead Counsel

83.    The Settlement provides for a recovery of $18 million in cash for the benefit of the Settlement Class. For the reasons set forth above and in light of the substantial risks of the litigation, Lead Counsel believes that the Settlement represents a decidedly favorable result for members of the Settlement Class in the face of significant litigation risk.

### 3.    The Skill and Experience of Plaintiff's Counsel

84.    The skill and expertise of Plaintiff's Counsel also supports the requested fee. In particular, Lead Counsel has extensive experience in successfully prosecuting some of the largest and most complex class actions in history, and is consistently ranked among the top Plaintiff' firms in the country. Lead Counsel's experience and track record in complex securities class action litigation are summarized in its resume attached as Exhibit 3A-3.

85.    The quality of the work performed by Plaintiff's Counsel in obtaining the Settlement should also be evaluated in light of the quality of the opposition they faced. Here, Defendants were represented in the litigation by Simpson Thacher & Bartlett LLP, counsel for Bumble, the Executive Defendants, the Director Defendants, the Blackstone Defendants, and Blackstone Securities Partners L.P.; and Shearman & Sterling LLP, counsel for the Underwriter

Defendants (except for Blackstone Securities Partners L.P.). These are top firms with considerable securities law experience who vigorously and ably defended the Action. Against this formidable opposition, Lead Counsel presented a case that was sufficiently strong that they were able to negotiate the substantial recovery reflected in the proposed Settlement.

### 4.    The Fully Contingent Nature of the Fee and the Extensive Risks of the Litigation

86.    This prosecution was undertaken by Plaintiff's Counsel on an entirely contingent-fee basis. The extensive risks by Plaintiff's Counsel in bringing those claims have been detailed above and those same risks are equally relevant to an award of attorneys' fees.

87.    From the outset, Plaintiff's Counsel understood that they were embarking on a complex, expensive, and likely lengthy litigation with no guarantee of compensation for the substantial investment of time, money, and effort that the case would require. Plaintiff's Counsel understood that Defendants would raise numerous challenges to liability, damages, and class certification, and that there was no assurance of success.

88.    In undertaking the responsibility of prosecuting this Action, Plaintiff's Counsel ensured that ample resources were dedicated to it, and that funds were available to compensate staff and to advance the significant expenses that a case of this magnitude and complexity requires. Indeed, Plaintiff's Counsel vigorously prosecuted this Action for the benefit of the Settlement Class and received no compensation, while incurring over $83,000 in expenses.

89.    Plaintiff's Counsel bore risk that no recovery would be achieved. Indeed, as summarized above, this case presented numerous risks that could have precluded any recovery. Also, success in contingent litigation such as this is never assured. To the contrary, it takes hard work and diligence by skilled counsel to develop facts and theories that are needed to induce

sophisticated defendants to engage in serious settlement negotiations involving significant sums of money.

90.     The Supreme Court has emphasized that private securities actions are "an essential supplement to criminal prosecutions and civil enforcement actions" brought by the *SEC. Amgen Inc., v. Conn. Ret. Plans & Trust Funds*, 568 U.S. 455, 478 (2013), citing *Tellabs, Inc. v. Ma-kor Issues & Rights, Ltd.*, 551 U.S. 308, 313 (2007); accord *Bateman Eichler, Hill Richards, Inc. v. Berner*, 472 U.S. 299, 310 (1985) (private securities actions provide "'a most effective weapon in the enforcement' of the securities laws'"). Further, as Congress recognized through the passage of the PSLRA, vigorous private enforcement of the securities laws can only occur if private plaintiffs, particularly institutional investors, take an active role in prosecuting securities class actions. If this important public policy is to be carried out, it is essential that Plaintiff's Counsel be adequately compensated for undertaking actions with significant risk and achieving remarkable results, as Plaintiff's Counsel did here. Indeed, compensating Plaintiff's Counsel for bringing the securities actions is also essential, because "[s]uch actions could not be sustained if Plaintiff's Counsel were not to receive remuneration from the settlement fund for their efforts on behalf of the class." *Hicks v. Morgan Stanley*, No. 01-CV-10071 (RJH), 2005 WL 2757792, at *9 (S.D.N.Y. Oct. 24, 2005).

### 5.    Lead Plaintiff's Endorsement of the Fee Application

91.     Lead Plaintiff is a sophisticated public pension fund that supervised and monitored both the prosecution and the settlement of this Action. Lead Plaintiff has evaluated the Fee Application and believes it to be fair and reasonable. As set forth in the declaration submitted by Louisiana Sheriffs, Lead Plaintiff has concluded that the requested fee has been earned based on, *inter alia*, the efforts of Plaintiff's Counsel and the favorable recovery obtained for the Settlement Class in a case that involved serious risk. *See* Declaration of Osey "Skip" McGee, Jr., Executive Director of Louisiana Sheriffs' Pension and Relief Fund, in Support of: (A) Lead Plaintiff's Motion

for Final Approval of Settlement and Plan of Allocation; and (B) Lead Counsel's Motion for Attorneys' Fees and Litigation Expenses (the "McGee Decl."), attached as Exhibit 1, at ¶ 7. This institutional Lead Plaintiff's endorsement of Lead Counsel's fee request provides further strong support for approving the requested 25% fee here.

### 6.    The Reaction of the Settlement Class To Date

92.    As noted above, as of June 28, 2023, a total of 85,389 Notice Packets had been mailed to potential Settlement Class Members and nominees advising them that Lead Counsel would apply for an award of attorneys' fees in an amount not to exceed 25% of the Settlement Fund. *See* Segura Decl. at ¶ 9. To date, no objection to the attorneys' fees set forth in the Notice have been received. Any objections that may be received will be addressed in Lead Counsel's reply papers, which are due July 26, 2023.

93.    In sum, Lead Counsel accepted this case on a fully contingent basis, committed significant resources to it, and prosecuted it without any compensation or guarantee of success. Based on the favorable result obtained, the quality of the work performed, the risks of the Action, and the contingent nature of the representation, Lead Counsel respectfully submits that a fee award of 25% is fair and reasonable and is amply supported by the fee awards courts in this Circuit in comparable cases.

### B.    The Expense Application

94.    Lead Counsel also seeks payment from the Settlement Fund of $83,125.85 in Litigation Expenses that were reasonably incurred by Plaintiff's Counsel in connection with commencing, litigating, and settling the claims asserted in this Action.

95.    From the beginning of the case, Plaintiff's Counsel were aware that they might not recover any of their expenses and, even in the event of a recovery, would not recover any of their out-of-pocket expenditures until such time as the Action might be successfully resolved. Plaintiff's

Counsel also understood that, even assuming that the case was ultimately successful, reimbursement for expenses would not compensate them for the lost use of the funds advanced by them to prosecute the Action. Accordingly, Plaintiff's Counsel were motivated to and did take appropriate steps to avoid incurring unnecessary expenses and to minimize costs without compromising the vigorous and efficient prosecution of the case.

96.    As set forth in Exhibit 3 hereto, Lead Counsel BLB&G has incurred a total of $83,125.85 in Litigation Expenses in connection with the prosecution and resolution of the Action. These expenses, as attested to in BLB&G's firm declaration, are reflected in the records maintained by BLB&G. These records are prepared from expense vouchers, check records, and other source materials, and provide an accurate accounting of the expenses incurred in this matter. The expenses are summarized in Exhibit 2 to BLB&G's firm declaration, which identifies each category of expense, e.g., expert fees, mediation charges, on-line legal and factual research costs, telephone charges, and photocopying expenses, and the amount incurred for each category. These expense items are submitted separately by BLB&G, and are not duplicated in the firm's hourly rates.

97.    Of the total amount of expenses, $39,575.00, or approximately 48%, was expended on the retention of Lead Plaintiff's testifying financial economics expert to provide a report concerning Louisiana Sheriff's losses as well as a consulting expert on damages to provide analyses relating to damages and causation, and assist with preparation of the proposed Plan of Allocation.

98.    Another substantial litigation expense was on-line legal and factual research. The on-line research conducted by Lead Counsel was necessary to, among other things, its factual investigation of the claims, the preparation of the Complaint, and responding to Defendants' Motion to Dismiss. The charges for on-line legal and factual research together amounted to

$21,303.94, or approximately 26% of the total expenses. These are the amounts that were charged to Lead Counsel by its vendors; Lead Counsel does not impose any surcharges or otherwise make any profit from these services.

99.    Lead Plaintiff's share of the mediation costs paid to JAMS, Inc. for the services of Jed D. Melnick, Esq. were $18,484.19, or approximately 22% of the total expenses. Again, this amount was charged to Lead Counsel by the Mediator and his firm for services that were important, as confirmed by the difficult and extended negotiations involved in reaching the proposed Settlement.

100.    The other expenses for which Lead Counsel seeks payment are the types of expenses that are necessarily incurred in class action litigation, including, among others, telephone charges and copying costs.

101.    All of the litigation expenses incurred by Lead Counsel were reasonably necessary to the successful litigation of this Action, and have been approved by Lead Plaintiff. *See* McGee Decl. ¶ 8.

102.    In addition, Lead Plaintiff Louisiana Sheriffs seeks reimbursement of $1,944.00 for the reasonable costs and expenses that it incurred directly in connection with its representation of the Settlement Class. Such payment is expressly authorized and anticipated by the PSLRA, as more fully discussed in the Fee Memorandum. Louisiana Sheriffs seeks reimbursement of $1,944.00 for the time expended in connection with the Action by Osey "Skip" McGee, Jr., its Executive Director, and Chris Dewitt, Deputy Chief Investment Officer of Louisiana Sheriffs, who spent time communicating with BLB&G and Klausner Kaufman, briefing the Board of Trustees of Louisiana Sheriffs, reviewing pleadings and motion papers, participating in the settlement

negotiations and mediation process, and evaluating and approving the proposed Settlement. *See* McGee Decl. ¶¶ 5, 10.

103.    The Notice informed potential Settlement Class Members that Lead Counsel would be seeking payment or reimbursement of Litigation Expenses in an amount not to exceed $200,000, which might include an application for the reasonable costs and expenses incurred by Lead Plaintiff directly related to its representation of the Settlement Class. The total amount of Litigation Expenses requested, $85,069.85, which includes $83,125.85 for the litigation expenses of Lead Counsel and $1,944.00 for costs and expenses incurred by Lead Plaintiff, is significantly below the $200,000 that Settlement Class Members were advised could be sought. To date, no objection has been raised as to the maximum amount of expenses set forth in the Notice.

104.    In view of the complex nature of the Action, the expenses incurred by Lead Counsel and Lead Plaintiff were reasonable and necessary to represent the Settlement Class and achieve the Settlement. Accordingly, Lead Counsel respectfully submits that the Litigation Expenses incurred are fair and reasonable and should be awarded in full from the Settlement Fund.

## IX.    ADDITIONAL EXHIBITS

105.    Attached hereto are true and correct copies of the following documents cited in the Fee Memorandum:

| | |
|---|---|
| Exhibit 4: | *In re L.G. Philips LCD Co. Sec. Litig.*, No. 1:07-cv-00909-RJS, slip op. at 1 (S.D.N.Y. Mar. 17, 2011), ECF No. 82 |
| Exhibit 5: | *Citiline Holdings, Inc. v. iStar Fin.*, *Inc.*, No. 1:08-cv-03612-RJS, slip op. at 1 (S.D.N.Y. Apr. 5, 2013), ECF No. 127 |
| Exhibit 6: | *Public Pension Fund Grp. v. KV Pharm. Co.*, No. 4:08-cv1859, slip op. at 2 (E.D. Mo. Apr. 23, 2014), ECF No. 199 |
| Exhibit 7: | *McGuire v. Dendreon Corp.*, No. 2:07-cv-00800-MJP, slip op. at 3-4 (W.D. Wash. Dec. 20, 2010), ECF No. 235 |

## X.    CONCLUSION

106.    For all the reasons set forth above, Lead Plaintiff respectfully submits that the Settlement and the Plan of Allocation should be approved as fair, reasonable, and adequate. Lead Counsel further submits that the requested fee in the amount of 25% of the Settlement Fund should be approved as fair and reasonable, and that the request for payment of total Litigation Expenses in the amount of $85,069.85 should also be approved.

I declare, under penalty of perjury that the foregoing is true and correct.

Dated: June 28, 2023                                    Respectfully submitted,


                                                        */s/ Jeremy P. Robinson*
                                                        Jeremy P. Robinson